### IN THE

## SUPREME COURT OF JUDICATURE

#### OF THE

## STATE OF NEW-YORK,

IN JULY TERM, 1835—IN THE SIXTIETH YEAR OF THE INDEPENDENCE OF
THE UNITED STATES.

---

## THE PEOPLE *vs.* FISHER and others.

A *conspiracy* of journeymen workmen of any trade or handicraft *to raise their wages*, by entering into combinations to coerce journeymen and master workmen employed in· the same trade or business, to conform to rules established by such combination for the purpose of regulating the price of labor, and carrying such rules into effect by overt acts, is indictable as a misdemeanor ; and it was *accordingly held*, where journeymen shoemakers conspired together and fixed the price of making coarse boots, and entered into a combination that if a *journeyman shoemaker* should make such boots for a compensation below the rate established, he should pay a penalty of ten dollars ; and if any *master shoemaker* employed a journeyman who had violated their rules, that they would refuse to work for him, and would quit his employment, and carried such combination into effect by leaving the employment of a master workman, in whose service was a journeyman who had violated their rules, and thus compelled the master shoemaker to discharge such journeyman from his employ—that the parties thus conspiring were guilty of a misdemeanor, and punishable accordingly.

A previous indictment for the same offence is no bar to a second indictment, although upon the first the defendant has been arraigned and pleaded.

ERROR from the Ontario general sessions. The defendants were indicted at the Ontario general sessions in May, 1834,

VOL. XIV.         2

for a *conspiracy.* The indictment contains four counts ; in the first of which it is alleged that the defendants, journeymen shoemakers, with divers other persons, also journeymen shoemakers, to the jurors unknown, on the first day of August, 1833, at the village of Geneva, in the county of Ontario, did unlawfully, and to the great injury and prejudice of the trade and commerce of the people of the state of New-York, with force and arms, &c. form and unite themselves into an unlawful club and combination, and did then and there conspire together, and with other persons to the jurors unknown, to *prevent* any journeyman boot and shoemaker, in the village of Geneva, from working in his trade and occupation *below certain rates and prices prescribed by the defendants* and their confederates, to the great injury of the trade of the state of New-York ; and did make and ordain certain unlawful and arbitrary by-laws, rules, constitutions and orders among themselves, thereby unlawfully and perniciously *intending to regulate and control themselves and other journeymen shoemakers* engaged in the trade of making boots and shoes at the village of Geneva ; and among other things, in respect to the price of making men's coarse boots ; and intending unlawfully and unjustly to exact and extort from master workmen engaged in the trade and business of making boots and shoes at the village of Geneva, large and exhorbitant sums for the making of men's coarse boots ; by which by-laws, &c. it was declared and established that journeymen shoemakers of the village of Geneva should not make a pair of men's coarse boots for a less price or hire than one dollar per pair, and if any journeyman shoemaker did work for less than one dollar per pair, that he should forfeit and pay to the club or association the penalty of ten dollars ; and the defendants and divers others, &c. did then and there confederate, combine and agree together that they would not after that day work for any master shoemaker who should employ any journeyman shoemaker who should thereafter infringe or break any of the said by-laws, &c. unless such journeyman shoemaker should pay the sum of ten dollars to the members of the club and combination for the use thereof, as a penalty for breaking the rules of the same. It is then alleged that one *Thomas J. Pennock,* being a journeyman shoe-

maker at the village of Geneva, on the 21st day of August, at, &c. broke one of the by-laws, by making ten pair of men's coarse boots, for one *Daniel L. Lum,* a master shoe-maker at Geneva, at and for the price of $\frac{75}{100}$ per pair, and refused to pay the penalty of ten dollars ; that after Pennock had thus broken the by-laws, Lum, on the 31st day of Au-gust, employed him in the way of his trade, of a journeyman shoemaker, to make men's coarse boots, at and for the price of $\frac{75}{100}$ per pair, and the defendants in pursuance of the said unlawful conspiracy, combination and agreement, afterwards, on the same day, *left the employ of Lum,* with whom they had theretofore worked by his employment in the trade and busi-ness of journeymen boot and shoemakers, and refused to work for him in the said trade, &c. as they theretofore had been accustomed to do, because and for the sole and only reason, that Lum had employed and then continued to em-ploy Pennock to make boots for him, after Pennock had broken the by-laws, &c. to the great injury of the trade and against the peace of the people of the state of New-York.

In the *second count,* after stating the conspiracy, it is al-leged that the defendants in pursuance thereof did prom-ise and agree to and among themselves, and to and with their confederates, that neither of them would be employ-ed for any master shoemaker *who should thereafter employ Thomas J. Pennock,* a journeyman boot and shoemaker, although Pennock was a good and free citizen of the state, and a good and faithful workman. It is then averred that on the 25th August, the defendants being in the employ-ment of *Lum,* the latter employed *Pennock* to make ten pair of men's coarse boots for him, whereupon, for the sole and only reason that he had so employed Pennock, the defendants unlawfully left the work and employment of Lum, and refused to work, &c. so long as he should employ Pennock. By means whereof Lum was compelled to dis-miss, and did dismiss Pennock from his employment and service, and ever since declined and refused to employ him in his trade and occupation of a journeyman shoema-ker, to the great prejudice of Pennock and of Lum, to the ob-struction of free and voluntary labor in the business of boot

UTICA,
July, 1835.

The People
v.
Fisher.

and shoemaking, to the injury of trade, in contempt of the laws, and against the peace of the people of the state of New-York, and their dignity. The third and fourth counts are substantially like the two former.

The defendants pleaded in abatement two indictments found against them in the same court for the same offence ; one of which was presented at the general sessions, held in November, 1833, and the other in February, 1834, on each of which they were arraigned, and to which they pleaded not guilty. The district attorney demurred to the plea thus put in, the defendants joined in demurrer, and the general sessions gave judgment that the defendants go thereof without day, assigning as the reason of the judgment, that the indictment is not sufficient, it not describing an offence known to and recognized by the laws of the state. The district attorney sued out a writ of error.

*H. F. Penfield,* (district attorney of Ontario,) for the people. The offence charged in the indictment is clearly within the provisions of the *revised statutes* declaring *conspiracies* for certain purposes, misdemeanors. 2 *R. S.* 691, § 8. The conspiracy here was to do an act injurious to trade. The defendants are charged with conspiring to prevent journeymen shoemakers making boots and shoes below certain prices arbitrarily fixed by the defendants and their associates, by means of a club, and the rules and by-laws thereof, and carrying such conspiracy into effect by divers *overt acts.* They are charged with conspiring to regulate the price of making coarse boots, to obstruct the free and voluntary labor and employment of journeymen shoemakers, and to deprive master workmen of the services of such journeymen shoemakers as should not conform to the prices prescribed by them, by agreeing not to work for any master workman who should employ a certain journeyman shoemaker named *Pennock,* and actually striking and refusing to continue to work for a master workman who did employ Pennock, who worked for him at $\frac{75}{100}$ per pair for boots, when the price fixed by the club was *one dollar.* That conspiracies to control the price of labor, or the products thereof, are misdemeanors at common law. He cited 3 *Chit. Crim.*

*Law,* 905, 1139, 927, 1163, *n.* 9, 934; 1 *Leach's C. C.* 274; 8 *Modern,* 10; 13 *East,* 228. He also cited a case in the New-York sessions, as long since as 1811, when an indictment against journeymen cordwainers for a conspiracy was sustained, *N. Y. Select Cases, page* 112, and contended that under the provisions of the revised statutes such conspiracies were still misdemeanors.

The plea of a *former indictment,* for the same offence, is bad at common law, 2 *Hawk. P. C.* 523, *B.* 2, *ch.* 34, § 1; and now by statute the first indictment is superseded by the second, and may be quashed. 2 *R. S.* 726, § 42.

*C. P. Kirkland,* for the defendants. The plea of another indictment pending for the same cause is analogous to a plea in abatement in a civil action, and ought to be upheld. The district attorney might have avoided it by entering a *nolle prosequi* and replying accordingly. The provisions of 2 *R. S.* 726, § 42, do not apply to this case; they might have been applicable, had this plea been interposed to the second indictment.

A mere agreement, without some *act* in pursuance of it, is not a conspiracy. A conspiracy therefore cannot exist by the mere *refraining, omitting,* or *refusing* to do an act. 2 *R. S.* 692, § 10.

The subject matter of the conspiracy here is merely the price of making men's coarse boots, and the consummation alleged is the *refusal,* &c. The allegations in the indictment that the defendants conspired to prevent journeymen, &c. from making boots and shoes below certain prices, and to extort from master workmen, and to injure trade, &c. are the statements of legal inferences merely, or are at all events qualified by and limited to the mode charged; and do not *per se* constitute a substantive ground of indictment.

The course of proceeding contemplated by the defendants was not "injurious to trade or commerce," within the meaning of the statute. It is not within the words of the act; the expressions "trade or commerce," are synonymous, and do not refer to the mechanic arts; consequently do not embrace this case. It is not within the spirit of the act. The act could

UTICA,
July, 1835.

The People
v.
Fisher.

never have been intended to apply to a controversy between master and journeymen mechanics, as to the price of making some particular article, the agreement as to which is the *gist* of the indictment in this case. The words of the act can be fully satisfied without extending them to this case.

The end conspired to be attained, and the means conspired to attain it, must be alike unlawful. It is denied in this case that either the end or the means was unlawful.

The principle of the indictment is arbitrary and unjust, and if sustained, would lead to a direct interference with and abridgement of the rights of the citizen. It would be the precursor of multitudes of idle prosecutions.

This being a penal and criminal statute, it will not be in any degree extended by construction. It is expressly provided by the 9th section of the act, that no conspiracies are punishable criminally, except those enumerated in section 8th.

*By the Court,* SAVAGE, Ch. J. We have the authority of *Hawkins* for saying that a plea of a former indictment pending for the same offence is bad, *Hawkins' P. C., book* 2, *ch.* 34, § 1; and by our revised statute, 2 *R. S.* 726, § 42, the first indictment is superseded by the second, and liable to be quashed. It is not therefore a bar to such second indictment.

The only question, therefore, is the one decided by the court below, whether the offence charged is indictable.

The legislature have given us their definition of conspiracies, and abrogated the common law on the subject. We must therefore see whether this case comes within the statute. The legislature have said, "If two or more persons shall conspire, either 1. To commit any offence; or 2. Falsely and maliciously to indict another for any offence, or to procure another to be charged or arrested for any such offence; or 3. Falsely to move or maintain any suit; or 4. To cheat and defraud any person of any property by any means which are in themselves criminal; or 5. To cheat and defraud any person of any property, by any means which if executed would amount to a cheat, or to obtaining money or property by false pretences; or 6. *To commit any act injurious to the public health, to public morals, or to trade or commerce;* or for the

perversion or obstruction of justice or the due administration of the laws—they shall be deemed guilty of a misdemeanor." 2 *R. S.* 691, § 8 ; and in section 9, it is declared that "no conspiracies, other than such as are enumerated in the last section, are punishable criminally." If the conspiracy charged in the indictment is an offence under this statute, it must be embraced under the sixth subdivision, and *is an act injurious to trade or commerce.*

The conspiracy in this case was *not to commit an offence* within the meaning of the statute ; the raising of wages is no offence—*the conspiracy is the offence,* if any has been committed. Nor was the object to indict any one ; to move or maintain a suit ; to cheat any one by criminal means, or by any means which, if executed, would amount to a cheat ; nor to obstruct the course of justice or the administration of the laws.

The question therefore is, is a conspiracy to raise the wages of journeymen shoemakers an act injurious to trade or commerce ? The words *trade* and *commerce* are said by *Jacobs,* in his Law Dictionary, not to be synonymous; that commerce relates to dealings with foreign nations ; trade, on the contrary, means mutual traffic among ourselves, or the buying, selling or exchange of articles between members of the same community. That the raising of wages and a conspiracy, confederacy or mutual agreement among journeymen for that purpose is a matter of public concern, and in which the public have a deep interest, there can be no doubt. That it was an indictable offence at common law is established by legal adjudications. In *The King* v. *Journeymen Tailors of Cambridge,* 8 *Mod.* 11, the defendants were indicted for a conspiracy among themselves to raise their wages; they were found guilty, and moved in arrest, among other things, that no crime appeared upon the face of the indictment. To this the court answer, that it is true that the indictment sets forth that the defendants denied to work under such wages as they demanded, but it was not for the *denial,* but the *conspiracy,* they were indicted ; and the court add, that a conspiracy of any kind is illegal, though the matter about which they conspired might have been lawful for them or any of them to do

without a conspiracy, and they refer to the case of *The Tub-women* v. *The Brewers of London*. This case has been cited as sound law by all subsequent writers on criminal law. *The People* v. *Trequier and others*, 1 *Wheeler's Cr. Cas.* 142, was an indictment against the defendants for a conspiracy to cause one Acker to be discharged from employment as a hatter, and refusing to work for their employers unless they would discharge Acker, because, as they alleged, he, Acker, worked for " knocked down wages." The facts of the case were much like the present, except that the defendants there were hatters, and here they are shoemakers. The counsel for the defendants contended that the doctrine of conspiracy was not applicable in this country. The defendants were convicted. Journeymen may each singly refuse to work unless they receive an advance of wages, but if they do so by preconcert or association, they may be punished for a conspiracy. 6 *T. R.* 636. Such was the construction of the common law; but in *England* the subject has been thought sufficiently important to require the special attention of the legislature, and statutes were enacted in the reign of Edward 6th and George 3d, which subject workmen, *conspiring* either to reduce the time of labor or to raise their wages, to the punishment of fine and imprisonment. I have found but few adjudications upon this subject; but *precedents*, in the absence of *adjudications*, are some evidence of what the law is. Among these, we find precedents at common law against journeymen for conspiring to raise their wages and lessen the time of labor, and to compel masters to pay for a whole day's work; against journeymen lamp-lighters, for conspiring to raise wages, and against journeymen curriers for the like offence, 3 *Chitty's Cr. Law*, 1163, *and note* 9; against salt-makers, for conspiring to enhance the price of salt; against journeymen serge-weavers, for refusing to work for a master who had employed a man contrary to certain rules entered into by conspiracy; against journeymen leather dressers, for conspiring to induce a man to turn a person out of his employment; against master rope-makers, for conspiring not to employ journeymen who had left their last master without his consent. Some of these offences seem to have had for their object the oppression and

injury of an individual; others were calculated to injure the
public. The immediate object in those cases, as in this, prob-
ably was to benefit the conspirators themselves; but if their
individual benefit is to work a public injury, a conspiracy for
such an object is against the spirit of the common law. The
offence of conspiracy seems to have been left in greater un-
certainty by the common law than most other offences. Mr.
*Chitty* states that all confederacies wrongfully to injure anoth-
er in any manner are misdemeanors. So the law was un-
derstood by this court, until the decision of the case of *Lam-
bert* v. *The People,* 9 *Cowen,* 578. The judgment of this
court was reversed in that case by the casting vote of the
president of the court for the correction of errors, but wheth-
er on the ground that conspiracy to defraud an individual
was not indictable, or on the ground that the indictment
was defective in omitting to state the means by which the
fraud was effected, it is impossible from the report of the
case to ascertain; and the question was left in doubt, wheth-
er an indictment lies for a conspiracy to produce a mere
private injury, by means which are not in themselves crim-
inal, and which would not affect the public, nor obstruct
public justice. That question was intended to be put at
rest by the revised statutes; and we have the authority of
the revisers for saying that this is the only particular in
which a departure from the common law doctrine was in-
tended, if indeed the common law was as it was understood
by this court. *See Revisers' Note to part 4, ch. 1. tit. 6.*

Whatever disputes may exist among political economists
upon the point, I think there can be no doubt, in a legal sense,
but what the wages of labor compose a material portion of
the value of manufactured articles. The products of me-
chanical labor compose a large proportion of the materials
with which trade is carried on. By trade, I now understand
traffic or mutual dealings between members of the same com-
munity, or internal trade. Coarse boots and shoes are made in
many parts of our country; not for particular persons who are
to wear them, but as an article of trade and commerce. Prob-
ably such is the case in Geneva, where this offence was com-

UTICA,
July, 1835.

The People
v
Fisher.

mitted. If journeymen boot makers, by extravagant de-mands for wages, so enhance the price of boots made in *Geneva*, for instance, that boots made elsewhere, in *Auburn* for example, can be sold cheaper, is not such an act injurious to trade ? It is surely so to the trade of Geneva in that par-ticular article, and that I apprehend is all that is necessary to bring the offence within the statute. It is important to the best interests of society that the price of labor be left to regulate itself, or rather be limited by the demand for it. Combinations and confederacies to *enhance* or *reduce* the prices of labor, or of any articles of trade or commerce, are injurious. They may be oppressive, by compelling the public to give more for an article of necessity or of convenience than it is worth; or on the other hand, of compelling the labor of the mechanic for less than its value. Without any officious and improper interference on the subject, the price of labor or the wages of mechanics will be regulated by the demand for the manufactured article, and the value of that which is paid for it ; but the right does not exist either to enhance the price of the article, or the wages of the mechanic, by any for-ced and artificial means. The man who owns an article of trade or commerce is not obliged to sell it for any particular price, nor is the mechanic obliged by law to labor for any particular price. He may say that he will not make coarse boots for less than one dollar per pair, but *he has no right to say that no other mechanic shall make them for less.* The cloth merchant may say that he will not sell his goods for less than so much per yard, but has no right to say that any other merchant shall not sell for a less price. If one indi-vidual does not possess such a right over the conduct of another, no number of individuals can possess such a right. All combinations therefore to effect such an object are inju-rious, not only to the individual particularly oppressed, but to the public at large. In the present case, an industrious man was driven out of employment by the unlawful meas-ures pursued by the defendants, and an injury done to the community, by diminishing the quantity of productive labor, and of internal trade. In so far as the individual sustains an injury, the remedy by indictment is taken away by

UTICA,
July, 1835.
The People
v.
Fisher.

our revised statutes, and the sufferer is left to his action on the case ; but in so far as the public are concerned, in the embarrassment to trade by the discouragement of industry, the defendants are liable to punishment by indictment.

If combinations of this description are lawful in *Geneva*, they are so in every other place. If the boot makers may say that boots shall not be made for less than one dollar per pair, it is optional with them to say that ten or even fifty dollars shall be paid, and no man can wear a pair of boots without giving such price as the journeymen boot makers may choose to require. This, I apprehend, would be a monopoly of the most odious kind. The journeymen mechanics might, by fixing their own wages, regulate the prices of all manufactured articles, and the community be enormously taxed. Should the journeymen bakers refuse to work, unless for enormous wages, which the master bakers could not afford to pay, and should they compel all the journeymen in a city to stop work, the whole population must be without bread. So of journeymen tailors, or mechanics of any description. Such combinations would be productive of derangement and confusion, which certainly must be considered " injurious to trade." Such consequences would follow were such combinations universal. It is true, that no great danger is to be apprehended on account of the impracticability of such universal combinations. But if universally or even generally entered into, they would be prejudicial to trade and to the public ; they are wrong in each particular case. The truth is, that industry requires no such means to support it. Competition is the life of trade. If the defendants cannot make coarse boots for less than one dollar per pair, let them refuse to do so ; but let them not directly or indirectly undertake to say that others shall not do the work for a less price. It may be that *Pennock*, from greater industry or greater skill, made more profit by making boots at seventy-five cents per pair than the defendants at a dollar. He had a right to work for what he pleased. His employer had a right to employ him for such price as they could agree upon. The interference of the defendants was unlawful ; its tendency is not only to individual oppression, but to public inconvenience and embarrassment.

I am of opinion that the offence is indictable, and that the judgment of the general sessions of Ontario county should be reversed, and that a *venire de novo* should issue.

Judgment accordingly.