## Oyer and Terminer—New York County.

*June,* 1886.

## PEOPLE *v.* WILZIG.

### EXTORTION—PENAL CODE, §§ 552, 553—"BOYCOTT."

It is against the criminal law for a number of men to band together for the purpose, through the power of combination, of injuring the business of another, by parading up and down before his door, by placarding themselves with the word "boycott," by advising the passers-by not to patronize the establishment, by distributing printed circulars filled with accusation and justifying the so-called "boycott," and by other devices calculated to induce the public to keep away from the alleged wrong-doer—provided the persons so engaged use force, threats or intimidation.

To constitute intimidation, it is not necessary that there should be any overt act of violence, or any direct threat by word of mouth.

It is enough if the attitude of those engaged in the overt act is intimidating; and this may be shown by their numbers, their methods, their placards, their circulars, and their devices.

If the attitude, conduct and method of these men is such as to deter any of complainants' customers, even the most weak and timid, from entering his place of business, or to inspire any part of the general public with the sense of danger in ignoring their appeals, there is intimidation within the meaning of the law.

The procuring of money from another, with his consent, obtained by fear induced by a threat to do or continue an unlawful injury to his property, *e. g.*, to continue a "boycott" as above described, constitutes the crime of extortion under sections 552, 553, Penal Code.

Every person present at the time the money, or the agreement under which it was paid, was obtained by extortion, and who aided and abetted in the acts of extortion, either by personal participation or by silently acquiescing in the threats of his associates, speaking in their joint behalf, is liable as a principal.

One who so participates in the acts of extortion, in consequence of which the money was paid, is liable as a principal, though not present when the money or check was actually received.

It is of no consequence as affecting the crime what is done with money so extorted — whether personally shared by defendants, or used to pay expenses of the "boycott."

TRIALS of indictment for extortion, under sections 552, 553, Penal Code.

The defendants, Paul Wilzig and others, were indicted April 30, 1886, under the above statute, in the Court of General Sessions of New York, which indictment was thereafter ordered to the Court of Oyer and Terminer for trial.

Defendants Michael Stroh and A. Rosenberg pleaded guilty. Defendants Paul Wilzig, Hans Holdorf and Max Dannhauser pleaded not guilty, and, upon their demands for separate trials, were tried and convicted before the Hon. GEORGE C. BARRETT and a jury—Wilzig, June 23, 1886; Holdorf, June 29, 1886 and Dannhauser, June 30, 1886.

The indictment was as follows:

"The grand jury of the city and county of New York, by this indictment, accuse the defendants of the crime of extortion, committed as follows: The said (defendants), each late of the first ward of the city of New York, in the county of New York aforesaid, on the twenty-third day of March, in the year of our Lord one thousand eight hundred and eighty-six, at the ward, city and county aforesaid, with force and arms, did feloniously and extorsively obtain from one George Theiss, who was then and there lawfully carrying on business in the said city, with his consent, a certain written instrument, being an order for the payment of money of the kind commonly called bank checks, and being then and there wholly unsatisfied, for the payment of, and of the value of, one thousand dollars, and the sum of one thousand dollars in money, lawful money of the United States, and of the value of one thousand dollars, of the personal property of the said George Theiss, such consent being then and there by them, the said (defendants), induced by a wrongful use of fear on the part of him, the said George Theiss, and such fear being then and there by them, the said (defendants), induced by a threat then and there by them made, to the said George Theiss, to do an unlawful injury to his property, that is to say, to injure and destroy the said business of him, the said George Theiss, and prevent and hinder him from carrying on the same, against the form of the statute, &c."

*Randolph B. Martine*, district attorney, *John R. Fellows* and *Ambrose H Purdy* (assistants), for the people, plaintiff.

*Howe & Hummel*, for defendants, Wilzig and Dannhauser.

*Augustus H. Van Wagener*, for defendant, Holdorf.

The facts are sufficiently set forth in the opening of the Holdorf case by Mr. Purdy, which was in substance as follows:

" *Gentlemen of the Jury:* The defendant is charged in the indictment with a violation of section 552 of the Penal Code, which provides that 'Extortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right.'

"We shall show to you that the defendant, together with the co-defendants, was guilty of extorting from another, with his consent, the sum of one thousand dollars, by the wrongful use of fear. Section 553 of the Penal Code provides: 'Fear such as will constitute extortion, may be induced by threat to do an unlawful injury to the person or property of the individual threatened.' We shall insist that the defendant, together with his co-defendants, was guilty of extortion by fear, superinduced by a threat to do an injury to the property of the individual threatened; and under sections 552 and 553 of the Penal Code, we shall demand his conviction, if the facts shall satisfy you, beyond all reasonable doubt, that he was guilty of such acts.

"The complainant, George Theiss, was the owner and manager of a large building in East Fourteenth street, New York city, used as a concert hall and a restaurant. He had an orchestra of thirteen pieces of music, and employed a large number of waiters, bar-keepers and the other various attaches of an establishment of this kind. His wife was his cashier, his son was his head bar-tender, and the leader of his orchestra was a man whom he had known for ten years, and who had been associated with him in business. The accumulations of a lifetime of toil were invested by Mr. Theiss in this business—some three hundred thousand dollars; in fact, all he had in the world was here.

About the 1st day of March, these defendants, strangers to him, came into his place of business, and one of them informed him that he was Paul Wilzig, of Waiters' Union, No.

1.  The others were Max Dannhauser and Hans Holdorf, of the Carl Sahm club; Michael Stroh and A. Rosenberg, of Bartenders' Union, No. 1; Michael O'Leary, Junior Squire and Almoner, of the Knights of Labor, and J. H. Beddles, of the Central Labor Union. They told Mr. Theiss that he should discharge his orchestra, and that he should not employ anybody but the members of the Carl Sahm club, and should pay them the union prices, as set forth in the constitution and by-laws of that club. Mr. Theiss informed them that he had nothing to do with the orchestra; that he had known Mr. Eschert for ten years, and that he had intrusted to him the employment of his orchestra, but that he did know that Mr. Eschert and all the members of his orchestra were members of the Musical Union, a body consisting of thirty-five hundred musicians in the city of New York, and that the wages paid were in accordance with the prices fixed by such union. Wilzig demanded that Mr. Theiss should discharge all of his waiters and employ only union waiters; that he should abolish the percentage system, and that he should not exact deposits for either badges or utensils; that the Central Labor Union were to be responsible for them. Stroh and Rosenberg, of Bar-tenders' Union, No. 1, demanded that he should discharge all his bar-tenders and employ only members of that union, and pay the prices fixed by that union. Mr. Theiss responded that his brother-in-law was his head bar-tender, and that his son was his head waiter, and he did not feel very much like discharging them, but since they did not belong to the unions, these defendants insisted that Mr. Theiss should discharge them.

Finally, Michael O'Leary, Almoner and Junior Squire of the Knights of Labor, and J. H. Beddles of the Central Labor Union, informed Mr. Theiss that they had merely come there to make their demands, and unless they were complied with in twenty-four hours, a boycott would be placed upon his business. At the expiration of the twenty-four hours, Mr. Theiss not having complied with the demands made upon him by the defendants, the boycott was ordered on.

" He found in front of his place of business a body of men walking up and down, wearing old and dilapidated hats pasted

over with circulars, headed 'boycott,' 'boycott,' libelous in their character, printed in German and English, announcing to the public that Theiss was a foe of organized labor, and calling upon all people to abstain and refuse to visit his place; that he was an obscene man; and this circular was signed by the boycott committee of the Central Labor Union. These libelous circulars were borne upon the backs of the procession. A great crowd of five hundred people was collected in front to witness this most unusual scene in the city of New York. The police were called upon; they arrested several of the men, and taking them before a police magistrate, they were discharged. Every afternoon and every evening for fifteen long days this boycott continued. The crowd that assembled there made it dangerous for any person to visit this place of amusement. The defendants, through their agents, as we shall show you, caused men to go inside of the place of business and paste these libelous circulars on the tables and in the water closets, and all about the premises. The walls, which had been frescoed at a vast expense by Mr. Theiss, were pasted by these boycott circulars, denouncing him as an obscene man, and foe of organized labor. They sought to raise a row and bring on a fight. His son, a young man of about twenty-three years old, in coming across the street in front of his father's place, was approached by one of those men, who undertook to paste one of the boycott circulars upon his cheek; he struck him and knocked him down; he was arrested in a civil action brought by this very man, only for the purpose of annoying his father. They raised the roof. The roof of this theatre consisted of glass and iron. They came in there one day with some sort of an infernal machine, and on setting fire to it, it emitted a stench such as no man could endure. The business of the place was suspended for a period of four hours, until the iron and glass roof was elevated, in order that the place might be ventilated. They set fire to the scenery on the stage.

" We shall show you that these defendants were the leaders in all these series of persecutions. We shall show you that they repeatedly came to the men, some fifty in number, who were employed by them to carry on these persecutions; they supplied them with refreshments, they relieved guard, so to

speak, taking off men who were tired and putting on fresh men, giving them segars, and in otherwise commanding and directing this whole business. Mr. Theiss was in the habit of purchasing his mineral waters from Mr. Shultz. We shall show to you, that this defendant and his colleagues went to Mr. Shultz; they demanded of him that he should not furnish Mr. Theiss with mineral water under pain of himself being boycotted, and that he yielded and refused to supply Mr. Theiss with mineral water. And still for fifteen long days this naturalized citizen 'held the fort,' his servants and employees all standing by him. At the expiration of that time Mr. Ehret, the brewer, was appealed to by these defendants. Mr. Ehret supplied Mr. Theiss with his beer—beer was the staple product in which Mr. Theiss dealt. Mr. Ehret held a mortgage of one hundred thousand dollars on Mr. Theiss' establishment. These defendants went to Mr. Ehret and demanded that he should foreclose the mortgage. Mr. Ehret replied to them that the mortgage not being due, and the interest being promptly paid by Mr. Theiss, he had no power to foreclose. They then demanded that Mr. Ehret should refuse to sell Mr. Theiss any more beer. They told Mr. Ehret that if he continued to supply Mr. Theiss with beer, that they would boycott his beer by the Knights of Labor throughout the United States. Under this threat, Mr. Ehret sent for Mr. Theiss, and Mr. Theiss, together with Mr. Eschert and a representative of each one of the employees in his establishment, went to Mr. Ehret's brewery, and they met these defendants, who made their demands. Mr. Theiss thereupon called upon his various employees to argue as to their rights. Mr. Eschert, for his orchestra, asked what he had done that he should be compelled to leave the employment of Mr. Theiss; he insisted that he belonged to the Musical Union; that he had labored here for many years in this employment, and that he was in good standing; that the wages which he paid were the scale fixed by the Musical Union of New York. The response was that he did not belong to the Carl Sahm club, and, therefore, that he must go. And so it was with all of Mr. Theiss' employees represented there. It was announced to them that these defendants had come there to demand terms, not to listen

to any argument or agree to anything. For eight long hours Mr. Theiss struggled in order to protect the seventy-five men who had labored with him for years, and with whose employment he was satisfied, and who were satisfied with the wages he was paying them. But Mr. Ehret being threatened with the boycott on his beer, labored with Mr. Theiss, and the result of the contest was, that finally he yielded, having agreed to everything that they demanded, as the representatives of these various labor unions. Then spoke up Beddles, who represented the Central Labor Union, and said we have not done with you yet; we want one thousand dollars as the expenses of the boycott. What expenses, demanded Mr. Theiss. The expenses of printing these libelous circulars, of which I have spoken to you — the expenses of paying the men who pasted his walls and destroyed the frescoes upon them — the expenses of setting fire to his place — the expenses of the stench in his place, and of destroying absolutely his business. The refinement of cruelty never reached such a pitch as this. He protested against this extortion; he said that five hundred dollars at the most was all they could have expended, but they told him, as we shall show you, that they had tolerated him long enough; that he should have paid and settled this long ago; and that unless he paid this one thousand dollars, and paid it at once, the Knights of Labor would order a perpetual boycott, and he could not then carry on business anywhere in the civilized world; that the Knights of Labor were organized and reached into every civilized community. He yielded, and signed the document, which I will now read to you; in my judgment, the most infamous ever been presented to a court of justice.

"*Mr. Paul Wilzig and others:*

" Mr. Theiss, in answer to the letter of your committee of the 13th of March, agrees to the following:

" He will discharge his present orchestra, including the leader, after Sunday, the 28th of March. He will employ members of the Carl Sahm Club, paying them the union prices as set forth in the constitution and by-laws of the Musical Mutual Protective Association—the orchestra to consist of twelve men to com-

mence with; Mr. Theiss to have the right to reduce this number if he finds it in his interest so to do, the Carl Sahm Club to be notified of such action.    Mr. Theiss also agrees to employ only union waiters, and to reinstate the strikers, and one man discharged; to abolish the *percentage* system, and not to exact, a deposit for their badges and utensils—the union being responsible for any loss of the same, and for any dishonesty of the waiters.

"The union scale of prices being not less than—

"Seven dollars per week for work from 7 to 12 o'clock P. M.

"Eight dollars per week for work from 7 to 1 o'clock P. M.

"Nine dollars. per week one day's labor of 10 hours, including meals, as heretofore.

"Twenty-five cents per hour to be paid for every hour's work after 10 hours.

"He also agrees to employ only Union bar-keepers at the union scale of prices, being not less than—

"Fifteen dollars per week, including meals, for first barkeeper.

"Twelve dollars per week, including meals, for second barkeeper and beer-tapper.

"He further agrees to pay the boycott expenses to the amount of one thousand dollars.

"The boycott to be discontinued at once.

"Signed this 23d day of March in the presence of:

> "PAUL WILZIG,
> "MAX DANNHAUSER,
>> *Waiters' Union No. 1.*
> "HANS HOLDORFF,
>> *Carl S. Club.*
> "MICHAEL STROH,
> "A. ROSENBERG,
>> *Bar-tender's Union No. 1.*
> "MICHAEL O'LEARY,
>> *J. S. A., K. of L.*
> "G. H. BEDDLES,
>> *C. L. U.*
> "GEORGE THEISS.

"GEORGE EHRET.

"EDWD. HENRY."

"Well, gentlemen, after he had signed this paper he did not have his check-book with him to give the one thousand dollars, but as soon as these leaders could get to the field of battle, their men were ordered off, as we shall show you, by the defendants themselves in person, and the boycott instantly ceased. The next morning these defendants came to his place of business, and they demanded the one thousand dollars, which he delivered to them in a check, in the body of which, as we shall show you, was written, 'for expense of boycott.' The defendants thereupon went to a beer saloon and got the proprietor to cash the check, and they divided it up amongst themselves; and the next day seventy-five laboring men were ordered out of the business of their employer, against his protest. Sorrowfully they left him, and in marched the representatives of the Waiters' Union No. 1, Bar-tenders' Union No. 1 and the Carl Sahm Club, all presided over by the Knights of Labor, took charge of this gentlemen's business, and undertook to run it for themselves."

The charge of the court in the Wilzig case was as follows:

"BARRETT, J.— Gentlemen of the Jury, I confess to be one of those who deeply sympathize with every effort of honest laboring men to better their condition in life. That sympathy I have felt ever since I have been able to think intelligently with regard to my fellow beings. It is, therefore, with me a subject of profound sorrow — and in referring to this I do not mean to reflect at all upon the present case — when I occasionally observe an attitude of lawlessness on the part of laboring men whose troubles and misfortunes I regret and whose lot I would do everything in my power to ameliorate and advance. This sorrow is the sorrow of a true friend, who knows the value of sympathy and who feels that lawlessness is sure to alienate it. He is the foe of honest labor who encourages unlawful acts and thus plays into the hands of the enemy — the enemy who rejoices at every mistake which alienates public sympathy and enables him to continue his oppression.

"We have a right to expect obedience to law from the laborer as well as from every other citizen.

"Indeed, his hopes depend upon a rigid enforcement of the law, and he is the last person who should set an example of its violation.   Laboring men may combine to change objectionable laws, but not to violate or trample on them.   A combination for the latter purpose would amount to a war on our institutions, and as our government is a government of law and can only exist by upholding the law, every agency in the land would be brought to bear to stamp out the lawless attack.   Of the result there can be no doubt.   It must, in the end, be adverse to those who defy the law.   Let me give a single word of counsel to those who are combining in trades-unions and similar associations of laboring men.   Before they appoint an executive committee, or even a finance committee, let them appoint a committee on the law.   Give that committee instructions to employ the very best counsel to advise as to what may lawfully be done and what may not lawfully be done.   Let them see to it that the lawyer is a safe and discreet counselor — no demagogue — some one who is not likely to need their votes.   Then let them follow his advice before taking any unusual or extraordinary step, and we will hear no more of lawlessness — no more of the alienation of public sympathy from laboring men seeking to improve their material and moral condition.

"And now, gentlemen, we come to the particular case at present under consideration.   We are here to-day to decide whether a crime has been committed by this defendant.

"I dare say you sympathize with labor as much as I do, but it is your duty not to allow your sympathy to influence you in the consideration of your verdict.   Nor are you to be influenced by any feeling of prejudice against this defendant or of passion resulting from the misconduct of others.   He is not responsible for any one else's lawlessness.   Without fear or favor, then, without passion or prejudice, you are to look at the law, as I shall state it to you, and at the evidence applicable to it, and decide this case.   If the law has been broken, it will be your duty to say so.   If it has not been broken, it will be your pleasure to say so.   This is the first case of the kind that has come before us, and we must look carefully into it.

"Let us see what workingmen, trying to better their condi-

tion, may lawfully do, and then let us see what they may not lawfully do. The law is tender of their rights. The old law of conspiracy has been greatly narrowed. Formerly a conspiracy of workingmen to raise the rate of wages was criminally condemned as an act injurious to trade or commerce.* But, now, it has been legislatively decreed that the orderly and peaceable assembling or co-operation of persons employed in any calling, trade or handicraft, for the purpose of obtaining an advance in the rate of wages and compensation, or of maintaining such rate, is not a conspiracy.† This is what laboring men may lawfully do. What they may not do is to combine together for the purpose of preventing other people from working at prices to suit themselves. The law defines a criminal conspiracy as follows: If two or more persons conspire to prevent another from exercising a lawful trade or calling, or doing any other legal act by force, threats, intimidation or by interfering or threatening to interfere, with tools, implements or property belonging to or used by another, or with the use or employment thereof; each of them is guilty of a misdemeanor. That is the law of conspiracy.

" You have heard some of the witnesses to-day talk in a very discreet and reasonable way on this subject. They told us that when grievously oppressed by an employer they felt that they had a right to go to their friends and solicit condemnation of the oppressor in some practicable form. Well, so they have. They have a right to go to all their friends, make known their wrongs, and say to them: ‘ If you are a friend of labor, withdraw your patronage from the man who injures us or refuses us justice.’ There is no law against that.

" But, gentlemen, that is not quite what we have to consider. It is one thing for a man or men to go about and talk to their friends, but it is quite another thing for fifty or sixty or one

---

* See Anon., 12 *Mod.* 248; R. *v.* Journeyman Tailors of Cambridge, 8 *Id.* 11; R. *v.* Eccles, 1 *Leach,* 276; R. *v.* Hammond, 2 *Esp.* 719; People *v.* Melvin (Journeymen Cordwainers' Case) 2 *Wheel.* 262; *Yates' Sel. Cas.* 111; People *v.* Trequier, 1 *Wh. Crim. Cas.* 142; People *v.* Fisher, 14 *Wend.* 9; Commonwealth *v.* Hunt, 4 *Metc.* 111.

† *Penal Code,* § 170.

hundred men to band together, not for the purpose of individual persuasion, but to bring the power of combination to bear in an unlawful way to injure the employer's business. And how? By parading up and down in front of his door, by placarding themselves with the word 'boycott,' by advising the passers-by not to patronize the establishment, by distributing printed circulars filled with accusation, and justifying the so-called 'boycott,' and by other devices and methods calculated to induce the public to keep away from the alleged wrong-doer. Now, the law says, that that may not be done, if the persons so engaged use force, threats or intimidation. Let us see what is meant by this word intimidation. The defendant's counsel seem to have the idea that if a body of men, however large, operating in the manner suggested, only avoid acts of physical violence, they are within the law; and that the employer's business may be ruined with impunity, so long as no blow is struck, nor actual threat by word of mouth uttered. This is an error. The men who walk up and down in front of a man's shop may be guilty of intimidation, though they never raise a finger or utter a word. Their attitude may, nevertheless, be that of menace. They may intimidate by their numbers, their methods, their placards, their circulars and their devices. It would be very easy to illustrate, gentlemen. Take one of our large dry-goods shops, and let it be boycotted in the manner suggested. Let fifty or one hundred men, with boycott placards on their backs and hats, crowd around the doors distributing offensive circulars, and requesting customers not to patronize the shop, and how many ladies do you suppose would have sufficient resolution to pass through the crowd, and to elbow their way into the shop? Not a hand need be raised, not an oath, nor even a violent word be uttered, and yet, in such a case, I should leave it to a jury to say whether the attitude of those men was not, under the pretense of moral suasion, an attitude of real menace; whether the weak and the timid were not, in reality, driven away, and whether the whole object and purpose was not to intimidate the gentle patrons of the establishment and the general public. And if so, I should further tell them that that was intimidation within the meaning of the law, though it might

not answer to prevent a few resolute and determined men who
knew their rights, and dared defend them, from entering and
purchasing.

"It is necessary for me to lay down these propositions to you,
in view of the fact that underlying this particular charge of
extortion is the prelude of the alleged conspiracy to injure
Theiss' business. Let us now consider the specific charge of
the indictment, namely, the alleged extortion of one thousand
dollars from Theiss. You have heard the evidence as to what
transpired at Theiss' place at the original interviews between
him and the committee, of which this defendant was one; of
the so-called boycott, which resulted from his refusal to accede
to the committee's demands; of the length of time it continued;
of the way it was operated; of the effect it had upon Theiss'
business, and at last of the conference at Ehret's, where Theiss
finally succumbed. Theiss acknowledges that the boycott was
too much for him, and that at this conference at Ehret's he
yielded to every demand of the committee (of which the de-
fendant was still one). He did discharge his orchestra; he did
take the men he was told to take; and he did pay them the
prices he was told to pay. You might imagine, perhaps, that
that would have ended it — but no. Now we come face to
face with the specific accusation here, which is, that when he
had yielded, when he was, so to speak, in the dust before these
men, they made the additional demand, in substance, that he
should pay the expenses to which they had been put in bring-
ing him to the dust. That he should pay the expense of print-
ing the very circulars, the distribution of which had annoyed
him, and the wages of the very men who had paraded in front
of his door distributing these annoying circulars. He declares
that these committeemen threatened that unless he paid that one
thousand dollars, the boycott would be continued, and not only
that, but that his business would be ruined and he would be
prevented from doing business elsewhere — in substance, that
he would be annihilated as a business man.

"Now we come to the question of credibility. If you be-
lieve, on the whole, that the one thousand dollars was extorted
from Theiss by the wrongful use of fear, the fear consisting of

and being induced by a threat to do an unlawful injury to his property, then this defendant is guilty, if he participated in this act. On that question of participation, it is proper to say that it is not necessary in law that the defendant should have been the person who actually and directly made the threat. 'A person,' says the law, 'concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, is a principal.'

"It is for you to say on this evidence whether, under the circumstances that transpired when the agreement to close up this boycott was made, the crime of extortion was committed within the provisions of the Code which I have given you, beyond any reasonable doubt (which you must always give the defendant the benefit of), and whether if that crime was committed, this defendant was a principal within the definition of a principal, as I have stated it to you. If not, he should be acquitted; but if he is, it will be your duty to convict him."

The charge of the court, in the Holdorf case, was as follows:

"BARRETT, J.—Gentlemen of the jury, although this case presents a question of extortion, pure and simple, yet underlying it and a necessary incident to its determination, is the question of lawful or unlawful combination. It will, therefore, be necessary for me to point out to you what the law is on the latter subject, so that you may determine whether the acts which preceded the alleged extortion were legal or illegal, and, if legal, what bearing they have upon the extortion question.

"You will see at a glance that any act which may be perfectly lawful when done by an individual, may become unlawful when done by a combination of individuals. A combination of men is a very serious matter. No one man can stand up against a combination; he may successfully defend himself against a single adversary, but when his foes are numerous and are combined, he must fall. The common law proscribed combinations of individuals to effect unlawful purposes. Even combinations to advance the rate of wages were denounced as

indictable conspiracies, although that has been abrogated by statute.

"In union there is strength. That is the key of the situation. Our law, appreciating the position of the laboring man, has modified the common-law rule, in reference to combinations and conspiracies, and has authorized this union, which is strength, for righteous purposes. The law recognizes the fact that the laboring man alone, single and unaided, is weaker than his moneyed employer, and so it permits the weaker to combine and co-operate to obtain certain just rights. Let us see to what extent, and for what purpose, the laborer is thus permitted to combine. He is permitted to combine for the purpose of obtaining an advance in the rate of wages, and for the purpose of maintaining such advance. Formerly that would have been a conspiracy, now it is lawful. But while the law has been considerate to the working man, and has given him this opportunity of protecting himself against those who are supposed to be more powerful than he, yet it holds him strictly within the limits of lawful means to attain his lawful ends. Thus, although he has the right to combine for the purpose of obtaining an advance in the rate of wages, he has no right to combine for the purpose of preventing others from exercising their lawful callings, or from working as they please. The law does not, as yet, permit such a combination as that, and I apprehend it will be a long time before any Legislature can be induced to legalize combinations for purposes so contrary to the genius of our people, and to the fundamental principle of our government. The workingman, then, has the right to combine to obtain an advance in the rate of wages, and to bring all the force of union, co-operation and united efforts to accomplish that proper and lawful object. So far, he acts within both the letter and the spirit of the law and the principles of natural justice; and in his lawful, efforts to attain his end he has the sympathy of every right-minded man. If he is able to accomplish his purposes lawfully every good man says to him, God speed. It is only when he deviates from that line and invokes the terrible maxim that the end justifies the means, that he forfeits

sympathy and good-will, and finds himself face to face with the determined opposition of every right-minded citizen. The righteous end does not justify illegal means. Nor can the righteous end ever be promoted.in the long run by unlawful means. · Let me illustrate. A number of men may combine together to obtain larger wages for themselves in any employment. They may stop working, if their employer unjustly refuses to accede to their just demands. So far, they are in the right. They may also do their utmost, by speech, writing, suasion, appeal, and in every other lawful way, to persuade their fellow-workingmen not to fill their places nor to aid the employer in his unjust attitude. But the very moment that other men, disregarding all appeals and entreaties, find it to their own interest to fill the vacant places, they cannot be stopped by violence, threats or intimidation. The moment workingmen resort to violence to prevent their brethren from filling the vacant places, the combination becomes criminal and organized labor becomes organized law-breaking. It may be natural for men who believe earnestly in the justice of their ends, to become impatient when they see that justice is slow, and to become irritable when frustrated by the necessities of their brethren; but it is their duty, under even such trying circumstances, to restrain their passions and not to destroy their hopes of ultimate success by lawlessness and by trampling violently upon the right of their brethren to work for whom they please and at such wages as they please. Workingmen cannot abuse the power of union which the law has liberally granted to them by such unlawful and tyrannical acts. They must bide their time, invoke public opinion, or seek a change in the law. That they do not know that violence under such circumstances is unlawful, is absurd. They are not as ignorant as some of their would-be friends pretend, and the suggestion that they are ignorant of the first principles of human right is a slander upon them. The truth is that occasionally the end is all that is thought of; passion rules the hour and the law is violated, and violated deliberately. This it behooves the laboring man of this country to see stopped. Should it continue or become at all general, it would not be long before the opposi-

tion to the means would run into opposition to the end, and thus all hope of amelioration would be lost.

"Now let us look at this question before us here. Of course, those men had no right to require that Theiss should discharge his orchestra, nor his waiters, nor his bar-tenders. The people who demanded this were not in Theiss' employ. They were not seeking an advance in their own wages. They were not even seeking officiously an advance in the wages of their brethren. What they wanted was to displace their brethren and to put themselves in their brethrens' places at their own prices. How it can be suggested that these men believe they had a right to do that, I cannot conceive. It seems like a tyrannical abuse of the power granted by law for righteous purposes. But such was their demand. It was clearly unlawful. The question remains whether this unlawful demand was sought to be enforced by unlawful means, and that depends upon the character of the so-called 'boycott.' Of course, gentlemen, it was unlawful to platoon the street in front of Theiss' place in great numbers, with strange devices, with placards and with circulars denouncing the men inside. That it was unlawful in the sense of the civil law, there can be no doubt whatever. It was an unlawful conspiracy within the civil law, for which an appropriate action for damages would lie. Whether the men were amenable to the criminal law is another question, dependent upon intimidation. The essence of the overt act is intimidation. I charge you that it was not necessary that there should be any overt act of violence, nor any direct threat by word of mouth. If those men (parading up and down, dressed as they were, doing what they did, distributing the circulars as they did) presented even to the weak and helpless an attitude of intimidation, that is sufficient. The gentle, the timid and the weak had the right to approach and quietly enter that place of entertainment without being molested, annoyed or disturbed; and if the attitude, conduct and method of these men was such as to deter any of Theiss' customers from entering his place, or to inspire any part of the public with the sense of danger in ignoring their appeals, then there was intimidation within the sense of the criminal law.

"That brings me to the question which I told you was the real question in this case, and upon which depends your verdict. These men are not indicted for a criminal conspiracy to prevent Theiss from exercising his lawful·calling. They are indicted for extorting money as the culmination of that conspiracy. And that brings us to the seven hours' debate at Ehret's which finally resulted in the settlement of the differences. We .cannot overlook the fact that that debate was necessarily colored by the existing boycott. Every one who participated in the conference at Ehret's was aware of the existence of the boycott, and that it was vigorously proceeding. The meeting had relation to the boycott, and it was because of that boycott that Theiss succumbed. It is conceded that he succumbed. He yielded to every demand; he agreed to discharge his orchestra; he agreed to take in their places members of the Carl Sahm Club; he agreed to the demands of the United Bar-keepers and of the United Waiters. All was agreed to.

"We come now to the test of the matter. At that stage of the conference, when everything had been agreed to, a demand was made for one thousand dollars to pay the expenses of the boycott; that is, the expenses to which those unions had been put in reducing Theiss to submission. It was extortion to procure that money from Theiss, with his consent, if the consent was induced by fear; that is, if the consent was wrested from him by the threat of continued injury to his property. If what Theiss says be true, not only was he threatened with the continuance of the existing state of things, called a boycott, but he was threatened with absolute ruin; that he could not do any business at all in this city or State or country; that he would be pursued relentlessly, and that if he did not pay the one thousand dollars the expenses of the boycott would be doubled every day. It is for you to say, gentlemen, whether these threats were made; you are the judges and the sole judges of the facts. If those threats were made, I apprehend the question will be speedily solved. But assume that that was not said, leave Theiss' extreme statement out of the case, and consider Ehret's testimony, that the threat was that the boycott

would not be raised unless the one thousand dollars was paid. That brings you to the consideration of the boycott, for if the one thousand dollars was extorted from Mr. Theiss by the threat of a continued, unlawful injury to his property, that is enough. So, if you believe that there was a threat that the boycott should continue, and if you further believe that that boycott was criminally illegal under the instructions I have given you, and was an injury to Theiss' property, then the defendant is guilty if he participated in the extortion and aided and abetted the others in forcing the agreement from him under which the money was paid. If you believe that beyond any reasonable doubt, it is your duty to convict the defendant. It is of no consequence, I should say in conclusion, what was done with the money. The crime consists in the extortion of the money, and not in the application or enjoyment of it. Nor is it essential that the defendant should have been present when the check was finally given. If the money was paid in consequence of extortion, which took place at the interview at Ehret's, then he is equally guilty, as though he had personally received the check.

"Thus the question is reduced to this: After Theiss had agreed to the demands, which certainly were unlawful, that is, such as no man had a right to make or to enforce by unlawful means, was the further agreement to pay one thousand dollars for the expenses of the boycott forced upon him by fear, induced by the threat of the continuance of illegal acts which were an injury to his property?

"If on the whole, you are of the opinion that that was not the case, then this defendant should be acquitted; but if you believe, beyond any reasonable doubt, on all the evidence, including the documentary evidence before you, that that was the case, it will be your duty to convict him."

The charge of the court in the Dannhauser case was as follows:

"BARRETT, J.— In this particular case, gentlemen, let me premise by saying that it does not make the slightest difference what disposition was made of the money. Whether or not the

persons who were present and signed this agreement received a penny of it for themselves is of no consequence. Whether the money, if obtained by extortion, was thrown into the sea or paid to the Central Labor Union or divided among the different unions, the crime is just the same. The crime, according to the law, consists not in the enjoyment of money, but in the extortion of it. Extortion, as defined in the Code, is the obtaining of property (and of course money is property) from another, with his consent, induced by a wrongful use of fear. And fear, such as will constitute extortion, may be induced by a threat to do an unlawful injury to the property of the individual threatened. There is the case in a nutshell.

"There is one other consideration to which I should call your attention lest there should be any confusion in your minds about it, and that is this: That if the money or the agreement to pay it was obtained by extortion, then every person who was present at the time the money was so obtained, or at the time the agreement to pay the money was so obtained, and aided and abetted in the acts of extortion, is just as much liable as the person who directly and actively made the threats which constituted the extortion. The law says: 'A person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, is a principal.'

"Therefore the question is, first, whether this money was extorted from Theiss, as extortion is defined by the law, and second, whether this defendant was present, aiding and abetting, in the sense of the law, either by personal participation or by silently acquiescing in the threats of his associates, speaking for him as well as for themselves.

"Now, let us look at the facts. We find that at the time this so-called agreement was signed, a certain state of things styled a 'boycott' existed at Theiss' establishment. What that state of things amounted to you have heard from the lips of the witnesses. It is not, therefore, necessary on this case to define a boycott. The acts of the people who paraded up and down in front of Theiss' place constitute the definition for the

purposes of this case.    What they did and were doing was the boycott there.

"I charge you that these acts were clearly unlawful, were a violation of Theiss' legal rights, and that an unlawful injury to his property was effected thereby.    There is here no disputed question of fact.    What transpired at Theiss' place was an unlawful attack upon his rights for which the combination of individuals guilty of that attack was civilly liable.    They were also criminally liable, provided they conspired to destroy his business, to prevent his exercise of a lawful calling by force, threats or intimidation.

"Let us now come down to this interview at Ehret's where the alleged extortion took place.    Of course what took place there must be considered with reference to the existing state of things at Theiss' establishment.    The object of that meeting was to bring about some adjustment, whereby this unlawful state of things should stop.    You must look at what took place there in that light.    There was the pressure on Theiss to have this unlawful and damaging state of things stopped.

"There was the determination on the part of the Labor Committee to enforce their demands.    It is not necessary to go over the evidence on that head.    Suffice it to say that Theiss succumbed.    He yielded to every demand made upon him.    The musicians demanded that he should discharge his orchestra, and he agreed to discharge every man.    They further demanded that he should employ their men at their prices, and to this also he agreed.    In like manner he yielded to the demands of the waiters and of the bartenders.

"At that stage of the proceedings, there came this fresh demand that he should pay one thousand dollars for the expense to which the people who were boycotting him had been put in boycotting him, to pay for the printing of the circulars and also to pay the wages of the very men who had been and then were walking up and down in front of his place to injure his business.

"This is what the charge of one thousand dollars was for. It is so specified in the agreement and it is so testified by all the witnesses, including this defendant.

"If you, believe, on this evidence, that that money was obtained from Theiss by extortion as defined in the Code; that is, that it was obtained from him with his consent, induced by fear; that is, by the threat to continue the unlawful injury to his property, which was then proceeding, that is extortion. Of course, gentlemen, if you believe all that Theiss testifies to — that is, if you believe that in addition to the threat to continue the boycott there was the threat to ruin him absolutely, to prevent him from doing business in the United States or elsewhere, to bring all the forces of the Knights of Labor to bear upon him — there can be no question at all about it. But though you may not credit all of this testimony, if you still believe that the defendant and his associates threatened to continue the injury to his property then proceeding, threatened in fact to continue the boycott which was essentially unlawful and was an injury to his property, then the extortion is made out just the same as though the greater threat is credited.

"The question of the defendant's participation is in a very narrow compass. He was there the whole time the discussion was going on. He signed the agreement with Wilzig, who was there on behalf of the Waiter's Union, he himself made a bracket connecting his signature with that of Wilzig.

"On the margin, near this bracket, the defendant wrote the words: 'Waiters Union No. 1.' The defendant says that no threats were made, but you have not only the evidence of Theiss on that point, but also that of the witness Eschert. He tells us that the threat with regard to the Knights of Labor was made by this defendant; also the threat that Theiss would be ruined by being unable to transact business in the United States or any part of the world. Eschert also tells us that this defendant ·spoke of a pressure which had been brought to bear upon others to force them to refrain from dealing with Theiss. You remember the illustration which he gave with regard to Mr. Schultz, the manufacturer of mineral water.

"The evidence of Eschert as to Schultz was not even denied by the defendant, and is, therefore, to be treated as uncontradicted testimony.

"It will be for you to say, gentlemen, on the whole case,

whether, considering that this man was present, that he participated in the discussion; that the discussion lasted a long time; that the final agreement was reduced to writing; that the writing was read in his presence and signed by him, and that he was present the next morning in the saloon just before the check was given, he was, within the meaning of the law, a principal. If, on the whole, and on all the evidence, you believe that the money was extorted from Theiss by the threat to injure his property, and that this defendant was a principal within the meaning of the law which I have laid down to you, it will be yours to convict, otherwise to acquit."

The court in sentencing the prisoners, July 1, 1886, made the following remarks:

"BARRETT, J.—Wilzig and others: The moral guilt attaching to the crime of which you have been convicted is heightened by the fact that you are not American citizens. Such socialistic crimes as these are gross breaches of national hospitality. What would you think of a man who, having sought an asylum from oppression or poverty in a friend's house, then proceeded to violate his friend's domestic rules, to disregard his customs and to disturb the peace, order and well-being of his household! Yet that is just what you and others of your union have been doing with regard to the national household of this country; a country that welcomed you and offered you equal opportunity with its own native-born citizens. Common gratitude should have prevented you from outraging public opinion, and using here those methods of a socialistic character which you brought with you from abroad.

"I trust that your conviction may incline the hearts of men of your race, and of all other races, to respect our laws, both in their spirit and in their letter. I trust that it may teach them that their best and truest friend is public opinion, and that they should endeavor to secure and retain that all-powerful factor in every laudable and righteous effort to ameliorate their condition. Public opinion is stronger than any union; it is an all-powerful foe to evil, and it is irresistible in the end, when on

the side of right. It is to that that you, and such as you, should appeal, and not to your own unbridled will.

"The lesson of these convictions, also, is to teach men that the taking of money to prevent or stop the so-called 'boycott' is little better than robbery or blackmail; also, to teach that the 'peaceable and orderly' pretense by which your agents sought to evade the criminal law, is a transparent sham; and that all bodies of men who parade in front of people's shops distributing offensive circulars and endeavoring to prevent public patronage, clearly present to our juries an attitude of intimidation, and are, therefore, conspirators who should and will be punished. I can hardly believe that you considered your action here to be right. It was simply an impulse of tyranny; an unrestrained exercise of the dangerous power of combination, and it was done in a cruel, heartless and unrelenting manner.

"But the law is not vindictive, and even your evil conduct will not close its eyes to some grounds of extenuation. You were, perhaps, misled by the erroneous judgment of the police justice who, in discharging you, certainly assumed a grave responsibility. You were, perhaps, also deceived or misled by bad advice. I do not know who advised you, nor what advice was given to you, but any counsel who, understanding what you were about to do, did not rebuke your action, was criminally culpable and unworthy of his honorable profession. There is another ground of extenuation, and that is that you did not do this for your own personal aggrandizement. It was unimportant, so far as the trial was concerned, whether you used the money for your own enjoyment or not, but it is a matter to be now considered. All these things, however, while they may have encouraged your disgraceful proceedings at Theiss' establishment, did not suggest the almost unspeakable excesses which attended the finale of your acts, when, having reduced this man to submission, having compelled him to sign the most degrading document which was ever presented to an American citizen, you completed your outrage by forcing him, still with your boycott pistol at his head, to pay, so to speak, for the powder and ball with which it was loaded, and which had been the threat of his business ruin. We are told that it has been the custom to rob

in that manner, and that such atrocities have become frequent in our midst. Let me say right here to the so-called walking delegate, that hereafter he enters people's offices (be they mercantile, manufacturing or shipping), with the danger before him of the extreme penalty of the law, should he venture to exact one unlawful penny from his victims.

"Now, let us see what consideration should be given to your individual cases, and how they should be discriminated. I always wish to be merciful, and am glad to find some proper basis for mercy, and I shall not impose the extreme penalty of the law here. I appreciate the fact that you are workingmen; that you were misguided; that in the preliminary boycott you may possibly have been deceived as to the legality of what you did. As to your final act of extortion, you could not have been deceived. You may not have supposed that you would be sent to State prison, but you must have known that what you did was little better than robbery, and that it was a piece of the grossest tyranny. It was wicked in itself, whether proscribed by the law or not, and therefore you had guilty hearts, unless you are willing to assume the position of being outside the pale of civilization.

"To you, Paul Wilzig, after a fair trial, and considering all the circumstances of the case, noting the fact that you were a violent spokesman, active and unrelenting in your demands, and particularly so in this last unspeakably criminal demand for money, the judgment of the law is, that you be confined at hard labor in the State prison for the period of two years and ten months.

"To you, Hans Holdorf, the same punishment is awarded. You stand, in my judgment, on precisely the same footing as Wilzig. The judgment of the law is, that you be confined at hard labor in the State prison for the period of two years and ten months.

"To you, Michael Stroh, there are additional grounds for mercy. You were not as active and ruthless as the others; in addition to that, you pleaded guilty, and have expressed contrition for your offense. The judgment of the court is, that

you be confined at hard labor in the State prison for the period of one year and six months.

"You, Rosenberg, stand on precisely the same footing as Stroh. The judgment of the court is that you be confined at hard labor in the State prison for the period of one year and six months.

"The last upon the list, Dannhauser, is the worst of all. There are few circumstances for merciful consideration in your case. You were more violent, if possible, than any of your fellows. You attempted to influence and intimidate other men, such as Schultz and Ehret. You were insolent and truculent in your demands. You saw two of your associates convicted after two separate trials. You heard two others plead guilty and express contrition. You were advised by your counsel to take the same position; but you refused and spent the time of the people on a perfectly useless trial. Upon that trial you tried to escape the fate of your brethren by as plain perjury as ever was committed, and by a cowardly pretense of gentleness. Your perjury has added to your guilt, which is greater than that of your associates, and the judgment of the court is that you be confined at hard labor in the State prison for the period of three years and eight months."

NOTE.— An interesting English case upon the subject of intimidation by " picketing " is Reg. *v.* Druitt, 10 *Cox Crim. Cas.* 592.

In that case, Baron Bramwell held (under 6 *Geo. IV.*, chap. 129, § 3, and 22 *Vict.*, chap. 34, § 1) that "picketing" done in a way to excite no reasonable alarm and not to coerce or annoy those who were subject to it, would not be an offense. It was lawful for the defendants to endeavor to persuade persons who had not joined the union to do so, provided that persuasion did not take the shape of coercion and intimidation. But even if abusive language and gestures were not used, if the pickets were so placed or so acted by watching the movement of the work people and masters, or by black looks, or by any other annoyance, as in the judgment of the jury would be likely to have a deterring effect in the minds of ordinary persons, it would be "molestation" and "obstruction." See also Reg. *v.* Shepherd, 4 *Cox Crim. Cas.* 325.