## ARGUED AND DETERMINED

#### IN THE

# COURT OF COMMON PLEAS,

#### FOR THE

## CITY AND COUNTY OF NEW YORK.

———————◆———————

### THE MASTER STEVEDORES' ASSOCIATION v. PETER H. WALSH.

The by-laws or pledge of an incorporated association of master workmen, sub-
scribed by the defendant, provided that any member of the association found
guilty by its committee of working for less prices than those fixed by the asso-
ciation, should forfeit to it twenty-five per cent. of the price fixed for the same
work, the penalty to be collected in the name of the association by process of
law: *Held*, on demurrer to the complaint, in an action by the association to col-
lect such a penalty,

1. That such an association was not an unlawful combination to commit any
any act injurious to trade or commerce within the meaning of 1 Rev. Stat. 691,
§§ 8, 9.

2. That such a by-law or pledge was not unlawful as made in restraint of
trade.

3. That the by-law, being one which the association had the power to make,
the association had also the power to attach to its violation a penalty, and an
action might be maintained for its recovery.

*Held further*, that the word "forfeit," as used in the by-law, was not equivalent
to a *forfeiture*, but meant a mere pecuniary penalty.

That it is not unlawful for any number of journeymen or master workmen to agree
on the one part that they will not work below certain rates, or on the other that
that they will not pay above certain prices; but any association or combination
for the purpose of compelling journeymen or employers to conform to any rule,

regulation, or agreement fixing the rate of wages to which they are not parties, by the imposition of penalties, by agreeing to quit the service of any employer who employs journeymen below certain rates, unless the journeyman pays the penalty imposed by the combination, or by menaces, threats, intimidations, violence, or other unlawful means, is a conspiracy for which the parties entering into it may be indicted.

The grounds on which *People* v. *Fisher*, 14 Wend. 9, was decided, reviewed, and the rules governing trades-unions stated.

SPECIAL TERM, *January*, 1867.

THIS was a demurrer to the complaint, on the ground that it did not state facts sufficient to constitute a cause of action.

The plaintiffs are a corporation of which the defendant is a member, and is, as its name imports, an association of master stevedores. The association adopted a by-law or "pledge" to the effect that there should be no variation from the prices adopted by the association, and that if any member, after an investigation by a committee, should be found guilty of working for less than the prices fixed, he should forfeit to the association twenty-five per cent. of the amount of such bill as fixed, which penalty might be collected in the name of the corporation by due process of law.

The complaint alleges that the by-law was subscribed to by the defendant, that the corporation had fixed the rate of discharging railroad iron from vessels at thirty-two cents a ton, and that the defendant had discharged fifteen hundred tons in violation of this regulation; that he was consequently found guilty by the association of working for less than the recognized price, and incurred a penalty of $125, for the recovery of which the action is brought.

*Joshua M. Van Cott*, and *Emerson & Goodrich*, for the plaintiff.

*C. C. Egan*, for the defendant.

DALY, F. J.—The complaint is demurred to upon the ground that no action lies upon the facts stated, the specific objection raised by the demurrer being that the by-law is illegal, because

the object it is designed to effect is one that is forbidden by law, and that no action can consequently be maintained upon it.

It is declared by the Rev. Stat. (vol. 1, p. 691, §§ 8 and 9), that it shall be unlawful for two or more persons to conspire to commit any act injurious to trade or commerce, and that the persons so conspiring shall be deemed guilty of a misdemeanor. In the *People* v. *Fisher* (14 Wend. 9), it was held that it was a violation of this statute for a body of journeymen shoemakers in the village of Geneva, in this State, to enter into an association for the purpose of preventing any shoemaker in the village from working below certain rates, which object the association sought to obtain by imposing a penalty of ten dollars upon any shoemaker in the village who worked for less, and by a mutual agreement among the members of the association that they would not work for any master shoemaker who should employ a journeyman who infringed their rules, unless the journeyman so infringing paid the ten dollars to the association, and which object was carried into effect by a number of the members of the association quitting the employment of a master shoemaker, who had employed a journeyman at rates below those which the association had agreed upon.

The feature which distinguishes this case from the one under consideration is, that coercive measures were there resorted to to compel a compliance, not only on the part of master shoemakers, but of journeymen not members of the association, with the regulations the combination had established. This was undertaking to interfere with the rights of others, and it has frequently been held that combinations to prevent any journeyman from working below certain rates, or to prevent master workmen from employing one except at certain rates are unlawful, and that the parties engaging in such combination may be indicted for a conspiracy (*Case of the Journeymen Cordwainers of the City of New York*, printed by J. Riley, New York, 1810. *Case of Journeymen Cordwainers of Pittsburg*, printed at Pittsburg, 1811. *Case of the Philadelphia Boot and Shoemakers*, Yates' Select Cases, 144. *The Philadelphia Journeymen Tailors' Case*, Phil. 1827, pp. 103, 160. *People* v. *Trequler*, 1 Wheeler's Criminal Cases, 142).

In the present case, the by-law was limited in its operation to the members composing the corporation, and is sought to be enforced against one who had voluntarily subscribed to it. In this respect it is distinguished from the case of *The People* v. *Fisher*, and from the other cases above cited; but if all the reasons which Chief Justice Savage assigned for the judgment of the Court, in *The People* v. *Fisher*, are to be received as law, they would apply to this case.

They are substantially as follows: That any confederacy or united agreement among journeymen, for the purpose of raising their wages, is an indictable offense at the common law; that journeymen may each, singly, refuse to work unless they receive an advance of wages, but if they do so by preconcert or association, they may be punished for a conspiracy; that if the journeymen bootmakers of the village of Geneva, by extravagant demands enhance the price of labor at that place, boots made elsewhere may be sold cheaper, and it is, therefore an act injurious to trade, so far as respects the trade of the village of Geneva in that particular article, which is all that is necessary to bring the offense within the statute; that the best interests of society require that the price of labor be left to regulate itself, or be limited by the demand of it; that a combination or confederacy to enhance or reduce the price of it, or of any article of trade or commerce, is injurious; that without officious and improper interference, the price of labor will be regulated by the demand for it, but the right does not exist to enhance it by any fixed artificial means; that a mechanic is not obliged by law to work for any particular price. He has a right to say that he will not make a boot for less than a certain price, but he has no right to say that no other bootmaker shall make one for less. If one individual does not possess such a right over the conduct of another, no number of individuals can possess it. All combinations, therefore, to effect such an object are injurious, not only to the particular individual opposed, but to the public at large. That if journeymen bootmakers may say what boots shall be made for, it would be optional with them to say that $10 or $50 shall be paid, which would be a monopoly of the most odious kind; that if journey-

men can in this way fix their own wages, they would have the power to regulate the price of any manufactured article, and the community might be enormously taxed; that if the journeymen bakers should refuse to work except for enormous wages, and should compel all the journeymen bakers in a city to stop work, the community would be without bread. Such combinations would be productive of derangement and confusion, and if generally entered into would be prejudicial to trade and to the public interest; the truth being that they are wrong in every instance, as industry requires no such means to support it, competition being the life of trade.

Much of what is here said is undoubtedly right, and it is forcibly put. Many of the reasons were applicable to the case before the court, which was correctly determined in accordance with the adjudged cases. The objection, however, is, that some of the propositions stated are not tenable, and that there is an omission throughout, to distinguish between what is entirely lawful for either journeymen or master workmen to do in their collective capacity, upon the subject of wages, and those unlawful combinations where the object is to control the rate of wages by the use of coercive measures.

It is not, nor has it ever been, a rule of the common law that any mutual agreement among journeymen for the purpose of raising their wages, is an indictable offense, or that they are guilty of a conspiracy if, by preconcert and arrangement, they refuse to work unless they receive an advance of wages. The Chief Justice admitted that he had found but few adjudications upon the subject, and that the offense of conspiracy had been left in greater uncertainty by the common law than most offenses. He remarked that precedents in the absence of adjudications were some evidence of what the law is, and he referred to several, but none of them warrant the conclusion that they were founded upon any rule of the common law. He referred to but two adjudged cases: *The King* v. *The Journeymen Tailors of Cambridge*, 8 Modern, 11, and *The Tub Women* v. *The Brewers of London*, the last of which cases, he says, has been cited as sound law by all subsequent criminal writers. There is no report of any case under such a name of *The Tub*

*Women* v. *The Brewers of London.* It is merely mentioned by
name in the case first above cited, as authority for the proposi-
tion that a conspiracy of any kind is illegal, though the matter
about which the parties conspired might have been lawful for
them, or any of them, to do, if they had not conspired to do it.
The first volume of the Modern Reports, in which this refer-
ence is found, is one of the least reliable of the English reports,
being full of inaccuracies, blunders, and misstatements. Bur-
rows, in his reports, speaks of it as " a miserable, bad book,"
and says, that upon being cited, the Court of King's Bench
treated it with the contempt that it deserved (1 Burr. 386 ; 3 id.,
1326) ; and by an excellent authority upon the books of reports
and their reporters, it is characterized by the epithet of execra-
ble (Wallace's Common Law Reporters, 3 ed. p. 226). The
title " *The Tub Women* v. *The Brewers of London,*" is un-
doubtedly a mistake, and it has been conjectured that the case
referred to is *The King* v. *Sterling and others*, reported in
1 Lev. 125 ; 1 Sid. 274 ; 1 Keb. 350. (See the conjectures of
Mr. Emmett and of Mr. Sampson respecting it, in Yates' Select
Cases, pp. 164, 211, 212). I entertain no doubt but that this
conjecture is correct, and a brief statement of that case will
suffice to show what was determined by it. The defendants—
brewers of London—were found guilty of a conspiracy, for
agreeing that they would brew no small beer—which was the
drink of the poor—for a certain length of time, nor ale, except
at a certain price, with the intent of moving the common people
to pull down the excise-house and to bring the excisemen into
public odium, that they might be impoverished and disabled
from paying their rent to the government, to the diminution of
the revenue ; which was a very clear case of conspiracy, the
design being to impair the public revenue, to inflict pecuniary
injury upon all the excisemen, and to stir up a public tumult.
Assuming it to be, as I have no doubt it is, the case referred to
under the supposititious title of the " *The Tub Women* v.
*Brewers of London,*" it would have been more correct to have
said that it warrants the conclusion that though the brewers, or
any of them, had the right to cease brewing, or to raise the
price of their ale, it was unlawful for them to combine to do

so for such an object as the one above stated. The case is an authority simply for a familiar principle of the criminal law, that it is a conspiracy to combine to do a lawful act for an unlawful purpose, or by unlawful means.

As respects the remaining case (*The King* v. *The Journeymen Tailors of Cambridge*), it is also found in this discredited volume of reports, in further condemnation of which I may cite the remark of an eminent English judge, Justice Wilmot, that, "nine cases out of ten in this book are totally mistaken" (*The King* v. *Harris*, 7 Term R. 238). But even the case, as reported there, affords no ground for the inference that there was any such rule at the common law as Chief Justice Savage supposed. In 1721, when the case was decided, there were acts of Parliament regulating the rate of wages. The defendants, according to the report, were indicted for refusing to work unless they received higher rates than the statute allowed. And, as far as can be gathered from the confused statement of the reporter, the conviction was held to be good, because they had conspired to raise their wages beyond what the law permitted. These early English statutes, regulating the price of labor, being wholly inapplicable to us in our colonial condition, were never in force in this country, and formed no part of the law of the Colony of New York, at the adoption of our State Constitution in 1777. This decision, therefore, was limited to England, deriving its whole effect from the English statute, the provisions of which it was held the defendants had conspired to defeat.

Chief Justice Gibson declared, in 1821, that it had never been decided in England that it was unlawful for journeymen to agree that they would not work, except for certain wages, or for master workmen to agree that they would not employ any journeymen, except at certain rates (*Commonwealth* v. *Carlisle*, 1 Hall's Journal of Jurisprudence for 1822, p. 225). And in corroboration of the statement of this very accurate and eminent jurist, I would add that I have examined down to the present time, and have found no case, either in this country or in England, in which any such decision has been rendered. In some of the elementary writers there are passages giving coun-

tenance to such a doctrine, and there are some observations of judges to the same effect. Justice Gross said, in *The King* v. *Mawrey*, 6 Term R. 636, that in many cases an agreement to do a certain thing has been considered the subject of indictment for a conspiracy, though the same act, if done separately by each individual, without any agreement among themselves, would not have been illegal ; as in the case of journeymen conspiring to raise their wages, each may insist upon raising his wages if he can, but if several meet for the same purpose, it is illegal, and the parties may be indicted for a conspiracy. But this was put simply by way of illustration, as there was no such question in the case, and was evidently made without examination, as no authorities are referred to ; and in the case of the *Philadelphia Boot and Shoemakers*, Yates' Select Cases, 144, and in the case of the *Philadelphia Journeymen Tailors*, Phil., 1827, pp. 103, 160, Recorder Levy said that a single journeyman may refuse to work, but many journeymen jointly must not ; but there the object of the combination was to coerce employers as well as third persons, and the point was not necessarily involved. In the *New York Cordwainers' Case, supra*, on the contrary, after an elaborate argument of the question, the court declared that they would not say that an agreement not to work except for certain wages would amount to a conspiracy, without unlawful means were resorted to to enforce it. This case was tried in this city in 1809. Justice Radcliffe, an eminent Judge of the Supreme Court, was on the bench, having associated with him another distinguished judge, Josiah O. Hoffman, and their united opinion upon such a question, after it had been learnedly discussed before them by four of the ablest counsel then in this State—Emmet, Colden, Griffin, and Sampson—is entitled to more consideration than the opinion, expressed by way of illustration, by Justice Gross, or the passing observation of Recorder Levy.

In the case of the *Philadelphia Journeymen Tailors*, printed at Philadelphia, 1827, Recorder Reed, upon a full examination of the subject, and after reviewing the opinion of his predecessor, Recorder Levy, held that an agreement among journeymen not to work unless they received certain wages,

where it did not extend beyond themselves, and where no other means were used, was not illegal, though it would be, if the object was to operate upon others not voluntarily entering into the agreement. Journeymen, he said, have an undoubted right, by an agreement among themselves, to regulate their own conduct, to ask as much as they please for their services; but the moment they undertake to interfere with the rights of others, or enter into combinations for such a purpose, the act is criminal and they become conspirators.

In the *Commonwealth* v. *Hunt* (4 Metc. 111), Chief Justice Shaw considered this question, and laid down the broad proposition that men are free to work for whom they please, or not to work if they so prefer, and that it is not criminal for them to agree together to exercise this right in such a manner as may best subserve their own interest; and in the case of the *Hartford Carpet Weavers*, tried before the Superior Court in Connecticut, in 1836, printed at Hartford, 1836, Chief Justice Williams told the jury that if the real nature of the agreement between the defendants was an agreement not to work below certain prices, that that was not an indictable offense, nor the subject of a civil action; that it had been so determined in that court, and under this ruling, the defendants were acquitted. This case is entitled to great weight. It was the third trial. A great deal of time was given to it, more than seventy witnesses having been examined. It was elaborately argued by counsel, and the ruling of the Chief Justice was made after the case had been considered upon appeal.

The absence of any adjudication upon this question at the common law may be attributable to the fact that there were statutes in England, from the passage of the Laborers' Act in the reign of Edward III., down to the reign of George IV., regulating the rate of wages, and forbidding agreements or combinations to evade these statutes; laws made in the interest of employers, in the creation of which those who were most affected by them had no share. By the Act of 5 Geo. IV. c. 95, all these statutes were repealed, and as this important statute was prepared with great care, its provisions may be appropriately referred to, both as indicating the state of common

law, and as furnishing a good exposition of what the law ought to be upon this subject. It prohibits all persons from attempting by threats, intimidation, or violence, to force any workman to quit his employment, or to prevent him from hiring himself to, or accepting work from any person, or for the purpose of compelling him to join any club or association, or to contribute to any common fund, or to pay any fine or penalty for not doing so, or for refusing to comply with any regulations made to obtain an advance, or to reduce the rate of wages, or to lessen the hours of labor, or the quantity of work; but the act, at the same time, declares that it shall be lawful for any persons to meet together, for the sole purpose of consulting upon or determining the rate of wages, which the persons so assembling shall require or demand, or the hours or time they will work in their respective employments, and that they may enter into any agreements, verbal or written, among themselves, for the purpose of fixing the rate of wages which the parties so agreeing may demand, and that the persons so uniting and agreeing shall not be liable to any prosecution or penalty for so doing.

The distinction which this statute makes between the legality of associations among workmen for the protection of their interests, by agreeing as a body not to work below certain prices, and an illegal combination formed for the purpose of making it compulsory upon all the journeymen in a particular branch of business, and upon the employers to conform to certain prices by imposing penalties upon the journeymen in a city or town who refuse to do so, or by agreeing as a body not to work for any employer who will employ such a journeyman, or one who will not pay the penalty or become a member of the combination, or which seeks to accomplish such a purpose by violence, intimidation, or other unlawful means, is one that has been slowly arrived at in England, and toward which the courts in this country have been gradually approximating, for the reason that it has its foundation in the plainest principles of justice. The apprehension that if this be conceded, it would place employers wholly at the mercy of their workmen, who would have it in their power to exact any sum for their services, however ex-

The Master Stevedores' Association v. Walsh.

travagant, is altogether an imaginary one. It is not possible, by any organization among journeymen, to bring about such a result. The history of English legislation upon the subject of wages, and of the operations of trades-unions, show that it is neither in the power of prohibitory laws nor of artificial combinations to control arbitrarily the price of labor, and that no combination can devise any general regulation or scheme that will bring to the same level the skillful and the incompetent, the diligent and the idle. All such matters regulate themselves. If labor is in demand, the rate of compensation will be enhanced in proportion; and if it is not, no combination among workmen can prevent the falling of prices. Voluntary associations among workmen, or agreements among them not to work except for certain prices, are effectual only when their demands are just and reasonable, and when they attempt any thing more, they not only fail of their object, but are themselves the chief sufferers. Workmen in every branch or calling are too universally diffused, too dependent upon their necessities, and too diverse in their interests, to make it possible by organization to accomplish any thing beyond this, for if those in any one place ask what is exceptionable or unreasonable, by the natural law of demand and supply, others will come in and take their places.

But it may be in their power to secure by associated effort what it would not be possible for any one of them to accomplish alone; and that they should have the right to associate together for the mutual protection of their individual interest is so plain, that it is singular that it should ever have been questioned. Journeymen may be as well acquainted as their employers with the causes which affect the price of labor, and in this country are generally well informed in such matters. They may be quite as well able to judge whether the ordinary profits of employers justify a reduction or an increase in the rate of wages. Why, then, should they not have the right to come together to consider the condition of the branch of industry in which they are operatives, to impart information to each other, to exchange their views, and discuss in a body a matter in which they are so deeply interested? Merchants meet daily

upon 'Change, that they may be thoroughly informed upon all matters relating to the traffic in which they are engaged; and why should not journeymen meet together to consider and act upon a subject so important to them as the general rate of wages. The exact sum which should be required for a day's wages may be fluctuating and uncertain, through the operation of other causes than those of demand and supply, such as the instability of the currency, by which the value of the paper representative of a dollar changes as the circulating medium is increased or diminished. These are matters for the consideration of workmen as well as all other causes affecting the price of their labor; and if they come together, and as the result of their deliberations conclude that a certain rate would be just and reasonable, and that they will not work for less, it would be the height of injustice to call such an act a crime, by declaring that it was, in the language of the statute, unlawfully conspiring to commit an act injurious to trade or commerce, for which each of them may be indicted and punished.

It is better for the law to leave such matters to the action of the parties interested—to leave master workmen or journeymen free to form what associations they please in relation to the rate of compensation, so long as they are voluntary. They mutually act upon each other. If the workmen demand too much, or the masters offer too little, such a state of things cannot continue long, or be productive of any serious inconvenience to the community, as that party must ultimately give way whose pretensions are not founded in reason and justice (*Regina* v. *Harris*, 1 Carr. and Marsh. 662). It is otherwise, however, where organizations are formed to intimidate employers, or to coerce other journeymen; and it matters little what are the measures adopted, if the object of them is to interfere with the rights or control the free action of others. It was held, under the English statute I have referred to, that it did not authorize workmen to combine for the purpose of dictating to a master whom he should employ (*Rex* v. *Rykerdyke*, 1 M. and Kobs, 179); and the several convictions in this country have been in cases where coercive measures were resorted to, either to

The Master Stevedores' Association v. Walsh.

prevent master workmen from employing journeymen except at certain rates, or to intimidate journeymen from engaging below such rates, or to compel them to become members of the combination. Every man has the right to fix the price of his own labor—to work for whom he pleases, and for any sum he thinks proper; and every master workman has equally the right to determine for himself whom he will employ, and what wages he will pay. Any attempt by force, threat, intimidation, or other coercive means, to control a man in the fair and lawful exercise of these rights is therefore an act of oppression, and any combination for such a purpose is a conspiracy.

It may, therefore, be laid down as the result of this examination, that it is lawful for any number of journeymen or of master workmen to agree, on the one part that they will not work below certain rates, or on the other that they will not pay above certain prices; but that any association or combination for the purpose of compelling journeymen or employers to conform to any rule, regulation, or agreement fixing the rate of wages, to which they are not parties, by the imposition of penalties, by agreeing to quit the service of any employer who employs a journeyman below certain rates, unless the journeyman pays the penalty imposed by the combination, or by menaces, threats, or intimidations, violence, or other unlawful means, is a conspiracy for which the parties entering into it may be indicted.

The act under which the defendants are incorporated (Laws of New York, 1863, p. 494), declares the object of the corporation to be " the better to promote the business and interests of the several members of the association," and a general power is given to make by-laws not inconsistent with the provisions of the act of incorporation, or of the laws of the State. There was nothing in the by-law inconsistent with the act of incorporation, or with the laws of the State. As individuals, the master stevedores might collectively enter into an agreement not to work under certain rates, and when formed into a corporation, they could, as a corporate body, make a by-law of that nature, being one, in the language of the statute, " to promote the business and interests of the association." If the by-law is

one which it is in the power of the corporation to make, it has the power also to attach to it a penalty for the purpose of·enforcing it. All who become members of the corporate body are bound by it, and where the penalty is incurred an action may be brought in the name of the corporation to recover it (*The Tobacco Pipe Makers* v. *Woodroffe*, 7 Barn. & C. 838; *King* v. *Clerk*, 1 Salk. 349; *Company of Feltmakers* v. *Davis*, 1 B. & P. 100; *Vinters' Company* v. *Passy*, 1 Burr. 239, 250; *Guardians of Trinity House* v. *Crispin*, T. Jones R. 144; *Leathy* v. *Webster*, Sayre, 251; Grant on Corporations, 76, 78, 82, 86, 87). The proper mode of enforcing a by-law is by a pecuniary penalty, for the corporation cannot, either directly or indirectly, impose any forfeiture of goods, or of stock, or other corporate interests for the breach of it (*Matter of the Long Island Railroad Company*, 19 Wend. 37), and the penalty must be certain (*Leathy* v. *Webster, supra*). The words of the by-law are, that the party shall forfeit to the association twenty-five per cent. of the amount of such bill as fixed by the association, *which penalty* may be collected by due process of law. Though the word forfeit is used, this is not a forfeiture (Grant on Corporations, 84, 85, 303), but a pecuniary penalty, and it is sufficiently certain.

This was not a by-law in restraint of trade, for it imposes no restraint upon one party which is not beneficial to the others, and is not, as has been shown, prejudicial to the interests of the public (*Chappel* v. *Brockaway*, 21 Wend. 157; *Lawrence* v. *Kidder*, 10 Barb. 641). The demurrer must be overruled, with costs.