## Supreme Court of Appeals of Virginia.

*May*, 1888.

## CRUMP *v.* COMMONWEALTH.*

BOYCOTT.—CRIMINAL CONSPIRACY.

An indictment states a criminal offense which charges a combination of defendants to ruin, break up and destroy the business of a specified firm, and that by the means used and the success of the unlawful endeavor it operated upon the peaceful and honest industries of the customers and patrons of that firm to their injury; and the indictment need not particularly state the means to be used by the conspirators.

The court instructed the jury in substance that if defendant then on trial for criminal conspiracy and one or more of the other defendants entered into an agreement to coerce a specified firm to discharge against their will certain of their employes and to take into their employment certain other persons whom that firm did not wish to take into its employment, then such agreement was unlawful, and if defendant, in pursuance of said agreement threatened

* The propositions in the syllabus not applicable to the law in New York, are marked with an asterisk. See upon the subject, generally, note at page 361, *infra*.

any of the said firm's customers that the persons making the agreement would injure the business of such customers by intimidating their customers, and making them afraid to continue their patronage of the customers of said firm, then defendant was guilty. *Held*, no error.

* The acts, as above specified, of defendant and his associate, commonly called a "boycott," are a conspiracy at common law.

Every attempt by force, threat, or intimidation to deter or control an employer in the determination of whom he will employ or what wages he will pay is an act of wrong and oppression, and every combination for such a purpose is an unlawful conspiracy.

* In law the offense of conspiracy is in the combination for the purpose, and no overt act is necessary to constitute it.

Writ of error to a judgment of the Hustings Court of the City of Richmond, rendered on May 23, 1887.

The instructions asked for and refused to defendant in the court below were as follows :

"(1) The court instructs the jury that if they believe from the evidence that the Typographical Union No. 90, was, at the time of the alleged conspiracy, and had been for eighteen or twenty years previous, an association of printers formed for the purposes set forth in the preamble of their constitution ; and that they authorized the defendants Crump, Wilde and Shelton to try to get the printing-offices in the city to agree to employ only persons who were then or should afterwards become members of said union, and, in case of failing to get anyone of said offices to so agree, to notify said office that the members of said union would thereafter refuse to deal with said office, and would try to persuade their friends to so refuse also, and to refuse to deal with anyone who should continue to deal thereafter with said office ; and that the said Wilde, Shelton and Crump attempted to persuade Baughman Bros. to so agree, but were refused by said Baughman Bros., and afterwards notified their friends of such refusal, and the patrons of said Baughman Bros. that the said union would not here-

after until the trouble with said Baughman Bros. was settled, deal with said Baughman Bros., or any persons dealing with them, and would try to get all their friends to act likewise, and in said endeavor used no force, violence, threat or personal intimidation against either Baughman Bros. or their patrons, then they must find the prisoner not guilty. (2) A person has a right to notify the public, or any number of persons, of his intention to do a thing, if he has a lawful right to do the thing itself. Two or more persons have a right to notify the public that they have agreed to do a certain thing, if they have the right to agree to do the thing itself. (3) A person has the right to notify the public that he will not deal with a certain person, or any other person dealing with that person, unless the reason given be slander or libel. Two or more persons have the right to agree to notify the public that they will not deal with a certain person, or any other person dealing with that person, unless the reason given be slander or libel. (4) In law, a threat is a declaration of an intention or determination to injure another by the commission of some unlawful act, and an intimidation is the act of making one timid or fearful of such declaration; but the announcement of an intention by several persons to do a thing which they have the right to do, either singly or together, cannot be a threat or an intimidation. And if the jury believe that the alleged conspirators confined themselves to merely announcing to the patrons of Baughman Bros. that they had stopped dealing with that firm, and would get their friends to agree with in their course, then the jury must find the prisoner not guilty. (5) If the jury believe from the evidence that the object of the alleged conspirators was to benefit and protect themselves in the pursuit of their calling or craft, and was not to injure Baughman Bros., although such might be the result, and that they confined themselves to notifying the public that they would not deal with Baughman Bros., or anyone thereafter patronizing that firm, and would attempt to get their friends to assist them in that course, then the

prisoner was not a party to an unlawful conspiracy, and he must be found not guilty."

*Meredith & Cocke,* for plaintiff in error.

*The Attorney General,* for the Commonwealth.

The opinion of the Supreme Court was as follows:

FAUNTLEROY, J.—This is a writ of error to a judgment of the Hustings Court of the city of Richmond, rendered on May 23, 1887. The plaintiff in error, W. F. Crump, was, on September 28, 1886, indicted for a criminal conspiracy by a grand jury impaneled in the said court. The indictment was against the said Crump and others, his co-conspirators, and it contained two counts. A general demurrer was filed to the indictment, and to each count thereof, which was sustained as to the second count, but was overruled as to the first count, which charges that " There is, and for more than than twelve months last past there has been, in the city of Richmond, a certain trades union or association called and known as ' Richmond Typographical Union, No. 90.' That there is in said city, and has been for more than twelve months last past, a mercantile firm or partnership composed of G. H. Baughman, E. A. Baughman, and C. C. Baughman, who do business, under the firm name and style of Baughman Brothers, as printers and stationers. That there is in the said city, and has been for more than twelve months last past, another trades union or labor association, called the ' Knights of Labor.' That the said partnership of Baughman Brothers have a lawful right to follow and pursue their said business as printers and stationers, without being molested or interfered with by anyone so long as they peaceably pursue the same according to the laws of the land. That the trades union or association called ' Richmond Typographical Union, No. 90,' is composed of about one hundred members, most of whom are to the grand jurors unknown. That the said trades

union or labor association called the 'Knights of Labor,' is composed of several thousand members, most of whom are to the grand jurors unknown. That Joseph M. Shelton, G. Waddy Wilde, and W. F. Crump are members of said trades union or association called 'Richmond Typographical Union, No. 90,' and W. H. Mullen, James A. Healy, J. M. Lewis, Perry Jones, and J. H. Schonberger are members of said trades union or labor association called 'Knights of Labor.' That within twelve months last past, to wit, on the 4th day of February, 1886, and on many days thereafter, the said G. Waddy Wilde, Joseph M. Shelton, and W. F. Crump, together with all the other members of the said trades union or association called 'Richmond Typographical Union, No. 90,' and W. H. Mullen, James A. Healy, J. M. Lewis, Perry Jones, and J. H. Schonberger, together with all the other members of the said trades union or labor association called the 'Knights of Labor,' who are to the grand jurors unknown, with force and arms, at the said city, and within the jurisdiction of the said Hustings Court, well knowing the facts hereinbefore averred, did unlawfully, maliciously, wickedly, and corruptly, knowingly and intentionally, combine, conspire, and confederate together to injure, ruin, break up, and destroy the said G. H. Baughman, E. A. Baughman, and C. C. Baughman, trading as Baughman Brothers, in their said business as printers and stationers, as aforesaid, by unlawfully, wickedly, maliciously, and corruptly, knowingly and intentionally, making threats to a great number of persons, to wit, to H. J. Myers, a member of a mercantile firm in said city trading as Slater, Myers & Co., which firm is composed of William L. Slater, Herman J. Myers, and John S. Wade; to William F. Seymore, a member of a mercantile firm in said city trading as J. H. Griffith & Co., which firm is composed of J. H. Griffith and William F. Seymore; to Luke Harvey, a member of a mercantile firm in said city trading as Ellison & Harvey, which firm is composed of William Ellison, Luke Harvey, and Fred. L. Swift; to G. A. Lathrop, a member of a mer-

cantile firm in said city trading as G̊. A. Lathrop & Co., which firm is composed of the said G. A. Lathrop; and to many other persons to the grand jurors, unknown,—all of whom had theretofore been regular customers of the said firm of Baughman Brothers,—that if they the said H. J. Myers, W. F. Seymore, Luke Harvey, G. A. Lathrop, or their said mercantile firms as above named, or other persons to the grand jurors unknown, thereafter bought anything from the said firm of Baughman. Brothers, or employed them, the Baughman Brothers, in their said business as printers, they, the said Wilde, Shelton, Crump, and all the members of the said trades-union or association called 'Richmond Typographical Union, No. 90,' and they, the said Mullen, Jones, Lewis, Healy, and Schonberger, and all the other members of the said trades-union or labor association called the 'Knights of Labor,' would do all in their power to break up and destroy the business of the said H. J. Myers, W. F. Seymore, Luke Harvey, G. A. Lathrop, and their said mercantile firms as above named, and many other persons to the grand jurors unknown, who had theretofore been customers of the said Baughman Brothers; and, by and through said threats, they, the said Crump, Wilde, Shelton, Mullen, Lewis, Healy, Jones, and Schonberger, and all the other members of the said trades union or association called 'Richmond Typographical Union, No. 90,' and all the other members of the said trades union or labor association called the 'Knights of Labor,' did then and there, by reason of said threats, drive off, hinder, deter, and prevent the said H. J. Myers, W. F. Seymore, Luke Harvey, G. A. Lathrop, and their said mercantile firms, as above named, and many other persons to the grand jurors unknown, who had theretofore been customers of the said Baughman Brothers, from buying anything from, or from dealing with in any way, or from employing as printers, the said firm or partnership of G. H. Baughman, E. A. Baughman, and C. C. Baughman, doing business as Baughman Brothers, as aforesaid; and they did then and there, by their said unlawful, malicious,

wicked, and corrupt threats, and by their said unlawful acts as hereinbefore set forth, do a serious injury to the business of the said Baughman Brothers, against the peace and dignity of the Commonwealth of Virginia."

The defendant W. F. Crump thereupon pleaded not guilty; and, electing to be tried separately, he was so tried, and the jury, on May 13, 1887, found him guilty by their verdict, and fined him $5, which verdict the court, upon motion of the defendant, refused to set aside and grant a new trial, but approved the said verdict, and entered up the judgment here complained of. Upon the trial, the defendant excepted to the rulings of the court, giving the instruction asked for by the Commonwealth, and refusing to give the instruction asked for by him; and he also excepted to the overruling by the court of his motion to set aside the verdict, and grant to him a new trial.

The first error assigned is the action of the court in overruling the demurrer to the first count of the indictment. It is objected that the indictment does not charge a conspiracy to do any unlawful act, and does not particularly state the means to be used by the conspirators to break up and destroy the business of Baughman Brothers, and show that the means to be used were unlawful. The objection cannot be sustained. It is wholly groundless and gratuitous, as is plainly manifest by the first count in the indictment (which we have purposely set out in full), to which the defendant pleaded, and upon which the issue was made up and tried, and under which the defendant was found guilty. It charges directly that the defendant and others "did unlawfully and maliciously, wickedly and corruptly, knowingly and intentionally, combine, conspire and confederate together to injure, ruin, break up, and destroy Baughman Brothers in their business as printers and stationers;" and that they did this by unlawfully, wickedly, maliciously, knowingly, intentionally, and corruptly making threats to a great number of persons mentioned, and others unknown to the grand jurors, all of whom had been and were at the time

regular customers and patrons of the said Baughman Bros.; and that they did then and there, by their said unlawful, malicious, wicked, and corrupt threats, and by their said unlawful acts, as hereinbefore set forth, do a serious injury to the business of the said Baughman Bros., and a still greater injury to the peace, dignity, and good name of the Commonwealth of Virginia, to the evil example of all her people." This specially and exactly charges a criminal conspiracy, unprovoked, wanton, and unlawful, both as to the end aimed at, and the means used to accomplish it. It charges a combination of this defendant and his co-conspirators to ruin, break up, and destroy the business of Baughman Bros.; and it charges that the means used and the success of the unlawful endeavor operated upon the peaceful and honest industries of the customers and patrons of Baughman Bros.

A conspiracy or combination to injure a person in his trade or occupation is indictable. In the case of Rex *v.* Eccles, 1 *Leach*, 274, several persons were indicted for conspiring to impoverish a tailor and to prevent him, by indirect means, from carrying on his trade. They were convicted, and upon a motion in arrest of judgment it was objected (as in this case), that the indictment ought to have stated the acts that were committed to impoverish the tailor, and prevent him from carrying on his trade, in order that the defendants might thereby have had notice of the particular charges they were called upon to answer. But Lord MANS-FIELD, without hearing the prosecution, said: "The conspiracy and object of it are both stated in the indictment; but it is contended that the means by which the intended mischief was effected ought also to have been particularly set forth, as in the case of Rex *v.* Sterling and others, 1 *Lev.* 125. But this is certainly not necessary; for the offense does not consist in doing the acts by which the mischief is effected, for they may be perfectly indifferent, but in conspiring with a view to effect the intended mischief by any means. The illegal combination is the gist of the offense." BULLER, J.,

said : " The indictment states ' that the defendants, intend-ing, unlawfully, and by indirect means, to impoverish the prosecutor, unlawfully did conspire,' etc. But nothing need to have been stated about the means; for the means are matter of evidence to prove the charge, and not the crime itself. The indictment, therefore, rather states too much than too little."

This case was under consideration in the recent case of Steamship Co. v. McGregor, 15 *Q. B. Div.* 476 (decided in 1885), when Lord COLERIDGE, Ch. J., said of the case : " It seems to both of us to be within the principle of an old case decided by Lord MANSFIELD (Rex v. Eccles, 1 *Leach,* 274, 276), and, so far as I know, the case itself is as good law now as when Lord MANSFIELD enunciated it, and could be upheld at the present day. It seems to me, also, to be within the principle neatly stated by TINDAL, Ch. J., in O'Connell v. Queen, 11 *Clark & F.* 234, as to what is evi-dence necessary to make out conspiracy; and also of the opinion of Lord FITZGERALD, in the case of Reg. v. Parnell, 14 *Cox Crim. Cas.* 474 (*The Times,* of January 25, 26, 1881). If the judgment of the learned judge is correct,— and I do not mean to intimate the slightest doubt as to its correctness,—that a conspiracy to do the thing which has been called by the name of ' boycotting' is unlawful, and an indictable offense, and, if so, then a thing for which an ac-tion will lie, an action may well lie for that which is com-plained of here."

" A combination is a conspiracy in law whenever the act to be done has a necessary tendency to prejudice the public, or oppress individuals by unjustly subjecting them to the power of the confederates, and giving effect to the purposes of the latter, whether of extortion or mischief." 2 *Whart. Crim. L.* (6th ed.) § 2322. In section 2304 of the same writer, it is said the unlawful purpose may be "some object of the confederation which it would be unlawful for them to attain either singly, or which, if lawful singly, it would be dan-gerous to the public to be attained by the combination of

individual means." See 3 *Greenl. Ev.* § 90. In the case of Reg. *v.* Druitt, 10 *Cox Crim. Cas.* 592, Baron BRAMWELL said : "The liberty of a man's mind and will, to say how he should bestow himself, and his means, his talents, and his industry, was as much a subject of the law's protection as was that of his body ;" and, " if any set of men agreed among themselves to coerce that liberty of mind and thought by compulsion and restraint, they would be guilty of a criminal offense,—namely, that of conspiring against the liberty of mind and freedom of will of those toward whom they conducted themselves. He was referring to coercion and compulsion,—something that was unpleasant and annoying to the mind operated upon ; and he laid it down as clear and undoubted law that if two or more persons agreed that they would, by such means, co-operate together against that liberty, they would be guilty of an indictable offense. The public had an interest in the way in which a person disposed of his industry and his capital ; and if two or more persons conspired, by threats, intimidation, or molestation, to deter or influence him in the way he should employ his industry, his talents, or his capital, they would be guilty of a criminal offense. This was the common law of the land," etc.

In the case of State *v.* Donaldson, 32 *N. J. L.* 157, it was held to be " an indictable conspiracy for several employes to combine and notify their employer that, unless he discharges certain enumerated persons, they will in a body quit his employment." In his opinion in that case, Chief Justice BEASLEY said : " There are a number of cases in which neither the purpose intended to be accomplished nor the means designed to be used, were criminal, which have been regarded to be criminal." Quoting State *v.* Norton, 23 *N. J. L.* 44 ; and citing Rex *v.* Gray, 2 *Harg. St. Tr.* 519 ; Rex *v.* Delaval, 3 *Burr.* 1434,—he says : " These are all cases, it will be noticed, in which the act which formed the foundation of the indictment would not in law have constituted a crime, if such act had been done by an individual, the combination being alone the quality of the trans-

action which made them respectively indictable." "The purpose designed to be accomplished becomes punitive, as a public offense, solely from the fact of the existence of a confederacy to effect such offense." "The doctrine of criminal conspiracy rests upon the obvious proposition that the power of many for mischief against the one is so great the State should protect the one. Therefore, the general principle on which the crime of conspiracy is founded is this: that the confederacy of several persons to effect any injurious object creates such a new and additional power to cause injury as requires criminal restraint, although none would be necessary were the same thing proposed or even attempted to be done by persons singly." "Now, that many acts which, if done by an individual, are not indictable, are punished criminally when done in pursuance of a conspiracy among numbers, is too well settled to admit of controversy. In many cases, an agreement to do a certain thing has been considered as the subject of an indictment for conspiracy, though the same act, if done separately by each individual, without any agreement among themselves, would not have been illegal." State v. Rowley, 12 *Conn.* 112, 113; Reg. v. Duffield, 5 *Cox Crim. Cas.* 432; State v. Crowley, 41 *Wis.* 271.

The next error assigned is the action of the court in giving the instruction asked for by the Commonwealth, as follows: "If the jury believed from the evidence that the defendant Crump entered into an agreement with one or more of the defendants, whereby they undertook to coerce the firm of Baughman Bros., to discharge from their employment, against the will of the said firm, certain persons then in their employment, and to take into their employment certain other persons that the said Baughman Brothers did not wish to take into their employment, then they are instructed that said agreement was unlawful; and if they believe, further, from the evidence, that, in pursuance and to carry out said agreement, he, the defendant, threatened any of the customers of the said Baughman Brothers they (the said persons making

said agreement) would injure the business of such customers by intimidating their customers, and making them afraid to continue their patronage of the customers of the said Baughman Brothers, then they must find the defendant guilty." The instruction plainly and correctly expounds the law against unlawful combination and guilty conspiracy to interfere with, molest, break up, and ruin the legitimate, licensed business of peaceable, useful, industrious, and honest citizens, and to accomplish this end by the threat and intimidation of doing "all in the power" of the conspirators to "break up and destroy the business" of all the existing or future customers of Baughman Bros., who should thereafter buy "anything from the said firm of Baughman Bros., or employ them, the said Baughman Brothers, in their said business as printers." And the instruction, so far from being a mere declaration of abstract law, is a direct and proper application of the law to the case put in the indictment and made by the evidence. It is next to impracticable to extend this opinion by reciting the evidence in detail further than we shall do when we come to consider the error assigned upon the admissibility and sufficiency of the evidence in the record to justify the verdict.

The instructions which were asked for by the defendant, and refused by the court, were properly refused, as they did not correctly expound the law, and were unwarranted by the evidence. And, more than the defect of having no predication in the evidence, they utterly and adroitly ignore the facts proved of the evil intent of the defendant and his confederates to do a wanton, causeless injury and ruin, to compel and coerce Baughman Bros. to give up the control and conduct of their long-established, useful, and independent business to the absolute dictation and control of a combination of the defendant and others, styling themselves "Richmond Typographical Union, No. 90," and to do this by the obtrusion, terrorism, excommunication, and obloquy of the "boycott" against Baughman Bros. and all their customers in Richmond, Lynchburg, and throughout Virginia

and North Carolina, *ad infinitum*, till they force the conquest and submission of all resistance to their demands and self-constituted management,—a reign of terror which, if not checked and punished in the beginning by the law, will speedily and inevitably run into violence, anarchy, and mob tyranny.

We come now to the main question involved in this appeal, whether the evidence set forth in this record presents a conspiracy at common law. The determination of this question is the object sought, as we not only infer from the paltry fine of five dollars imposed by the verdict, but by the intimation in argument by the able and accomplished counsel for the defendant. Is "boycotting," as resorted to and practiced by the conspirators in this case, allowable under the laws of Virginia? For a legal definition or explanation of the meaning and practical effect of the cabalistic word, as well as for a pertinent exposition of the law applicable to the facts of this case, we refer to the admirable opinion of Judge WELLFORD, of the Circuit Court of the city of Richmond, in the case of Baughman *v.* Askew, *Va. Law J.*, April, No. 196, and also to the decision of the Supreme Court of Connecticut, in the case of State *v.* Glidden, 55 *Conn.* 76. In that case the court says: "We may gather some idea of its (boycotting) real meaning, however, by a reference to the circumstances in which the world originated. These circumstances are thus narrated by Mr. Justin McCarthy, an Irish gentleman of learning and ability, who will be recognized as good authority : ' Captain Boycott was an Englishman, an agent of Lord Earne, and a farmer of Lough Mask, in the wild and beautiful district of Connemara. In his capacity as agent, he had served notice upon Lord Earne's tenants, and the tenantry suddenly retaliated.' ' His life appeared to be in danger. He had to claim police protection.' 'To prevent civil war the authorities had to send a force of soldiers and police to Lough Mask, and Captain Boycott's harvest was brought in and his potatoes dug by the armed Ulster laborers, guarded always

by the little army.'" The court proceeded to say: "If this is a correct picture, the thing we call a boycott originally signified violence, if not murder. But even here, if it means, as some high in the confidence of the trades union assert, absolute ruin to the business of the person boycotted, unless he yields, then it is criminal." The essential idea of boycotting, whether in Ireland or the United States, is a confederation, generally secret, of many persons, whose intent is to injure another by preventing any and all persons from doing business with him, through fear of incurring the displeasure, persecution and vengeance of the conspirators. In the case of State *v.* Donaldson, 32 *N. J. Law,* 151, Chief Justice BEASLEY, in delivering the opinion of the court, said: "It appears to me that it is not to be denied that the alleged aim of this combination was unlawful. The effort was to dictate to this employer whom he should discharge from his employ. This was an unwarrantable interference with the conduct of his business," etc. "If the manufacturer can be compelled in this way to discharge two or more hands, he can by similar means be coerced to retain such workmen as the conspirators may choose to designate. So his customers may be proscribed, and his business in other respects controlled. I cannot regard such a course of conduct as lawful." Chief Justice SHAW, in the case of Commonwealth *v.* Hunt, 4 *Metc.* 111, says: "The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality through whatever disguises it may assume. It is said that neither threats nor intimidations were used, but no man can fail to see that there may be threats, and there may be intimidations, and there may be molesting, and there may be obstructing (which the jury are quite satisfied have taken place from all the evidence in the case), without there being any express words used by which a man should show any violent threats towards another, or any express intimidation." "An intention to create alarm in the mind of a manufacturer, and so to force his assent to an alteration in the mode of carrying on his business, is a

violation of law." Reg. *v.* Rowlands, 5 *Cox Crim. Cas.* 436, 462, 463; Doolittle *v.* Schandbacher, 20 *Cent. Law J.* 229. Upon the trial of boycotters in New York, Judge BARRETT said: "The men who walk up and down in front of a man's shop may be guilty of intimidation, though they never raise a finger or utter a word. Their attitude may nevertheless be that of menace. They may intimidate by their numbers, their pleadings, their methods, their circulars, and their devices."

It matters little what are the means adopted by combinations formed to intimidate employers or to coerce other journeymen, if the design or the effect of them is to interfere with the rights or to control the free action of others. No one has a right to be hedged in and protected from competition in business; but he has a right to be free from wanton, malicious, and insolent interference, disturbance or annoyance. Every man has the right to work for whom he pleases, and for any price he can obtain; and he has the right to deal with and associate with whom he chooses, or to let severely alone, arbitrarily and contemptuously, if he will, anybody and everybody upon earth; but this freedom of uncontrolled and unchallenged self-will does not give or imply a right, either by himself or in combination with others, to disturb, injure, or obstruct another, either directly or indirectly, in his lawful business or occupation, or in his peace and security of life. Every attempt, by force, threat or intimidation, to deter or control an employer in the determination of whom he will employ, or what wages he will pay, is an act of wrong and oppression; and any and every combination for such a purpose is an unlawful conspiracy. The law will protect the victim and punish the movers of any such combination. In law the offense is the combination for the purpose, and no overt act is necessary to constitute it. State *v.* Wilson, 30 *Conn.* 507; State *v.* Donaldson, *supra;* Walker *v.* Cronin, 107 *Mass.* 564; Carew *v.* Rutherford, 106 *Mass.* 10–15; Association *v.* Walsh, 2 *Daly,* 12; Walsby *v.* Anley, 3 *Law T. N. S.* 666; Reg. *v.* Duf-

field, 5 *Cox Crim. Cas.* 432; Parker *v.* Griswold, 17 *Conn.* 302; Spinning Co. *v.* Riley, *L. R.* 6 *Eq.* 551; Gilbert *v.* Mickle, 4 *Sandf. Ch.* 381. A wanton, unprovoked interference by a combination of many with the business of another, for the purpose of constraining that other to discharge faithful and long-tried servants, or to employ whom he does not wish or will to employ,—an interference intended to produce, and likely to produce, annoyance and loss to that business,—will be restrained and punished by the criminal law, as oppressive to the individual, injurious to the prosperity of the community, and subversive of the peace and good order of society.

The recent case of State *v.* Glidden, already referred to, decided by the Supreme Court of Connecticut, is, both in principles and features, identical with the case under review. The Carrington Publishing Company had in their employ a number of printers known as " non-union men," or "rats." The Typographical Union, the Knights of Labor, the Trades' Council, the Cigar-Makers' Union, and other affiliated secret organizations, waited upon the company, and demanded that their office be made a "union office" within twenty-four hours. Upon the refusal of the company to make their office a " union office," a boycott was instituted against them, which, though not openly published, as in this case, was fully proved. The court in its opinion said: " If the defendants have the right which they claim, then all business enterprises are alike subject to their dictation. No one is safe in engaging in business; for no one knows whether his business affairs are to be directed by intelligence or ignorance, whether law and justice will protect the business, or brute force, regardless of law, will control it; for it must be remembered that the exercise of the power, if conceded, will by no means be confined to the matter of employing help. Upon the same principle and for the same reasons the right to determine what business others shall engage in, when and where it shall be carried on, etc., will be demanded, and must be conceded. The

principle, if it once obtains a foothold, is aggressive, and is not easily checked. It thrives on what it feeds on, and is insatiate in its demands. More requires more. If a large body of irresponsible men demand and receive power outside of law, over and above law, it is not to be expected that they will be satisfied with a moderate and reasonable use of it. All history proves that abuses and excesses are inevitable. The exercise of irresponsible power by men, like the taste of human blood by tigers, creates an unappeasable appetite for more." " Confidence is the corner-stone of all business, — confidence that the government, through its courts, will be able to protect their rights. But, if their rights (of business men) are such only as a secret, irresponsible organization is willing to give, where is that confidence which is essential to the prosperity of the country ?" " The end would be anarchy pure and simple, and the subversion, not only of all business, but also of law and the government itself." " They (defendants) had a right to request the Carrington Publishing Company to discharge its workmen and employ themselves, and to use all proper argument in support of their request; but they had no right to say, ' You shall do this or we will ruin your business.' Much less had they a right to ruin its business. The fact that it is designed as a means to an end, and that end, in itself considered, is a lawful one, does not divest the transaction of its criminality." The defendant lays great stress upon the case of Commonwealth v. Hunt, 4 Metc. 111, as authority to sustain the legality of boycotting; but there is an obvious distinction between that case and that of this defendant. That was a club or combination of journeymen boot-makers simply to better their own condition, and it had no aim or means of aggression upon the business or rights of others. They simply had regulations for themselves, and did not combine or operate for a result mischievous, meddlesome, and oppressive towards others. But, even in that case, the court, after supposing the case of a combination for the ultimate and laudable object of reducing by mere competi-

tion the price of bread to themselves and their neighbors, said: "The legality of such an association will therefore depend upon the means to be used for its accomplishment. If it is to be carried into effect by fair and honorable means, it is, to say the least, innocent; if by falsehood or force, it may be stamped with the character of conspiracy." Force may be operated either physically or mechanically; or it may be coercion by fear, threat, or intimidation of loss, injury, obliquy, or suffering.

The evidence in this case shows that, while Baughman Bros. were engaged in their lawful business as stationers and printers, the plaintiff in error, and the other members of the Richmond Typographical Union, No. 90, conspired to compel Baughman Bros. to make their office a "union office," and to compel them not to employ any printer who did not belong to the said union. That, upon the refusal of Baughman Bros. to make their office or business a "union office," the plaintiff in error and others, composing the said Richmond Typographical Union, No. 90, conspired and determined to boycott the said firm of Baughman Bros., as they had threatened to do; and sent circulars to a great many of the customers of the said firm, informing them that they had, "with the aid of the Knights of Labor and all the trades organizations in this city (Richmond), boycotted the establishment of Messrs. Baughman Brothers;" and formally notifying the said customers that the names of all persons who should persist in trading, patronizing, or dealing with Baughman Bros., after being notified of the boycott, would be published weekly in the *Labor Herald*, as a blacklist, who, in their turn, would be boycotted until they agreed to withdraw their patronage from Baughman Bros.; and accordingly the employes of Baughman Bros. were mercilessly hounded, by publication after publication, for months in the *Labor Herald* (which was the boasted engine of the boycotting conspirators), whereby it was attempted to excite public feeling against them, and prevent them from obtaining even board and shelter; and the names of

the customers and patrons of the said firm were published in the said sheet under the standing head of "black-list." The length of this opinion will preclude the mention of even a tithe of these incendiary publications, week after week, for months; but not only Baughman Bros., and their employes and their customers, but the hotels, boarding - houses, public schools, railroads, and steamboats conducting the business, travel, and transportation of the city, were listed and published under the obloquy and denunciation of the black-list. One or two specimens will suffice: "Boycott Baughman Brothers, and all who patronize them." "Watch out for Baughman Brothers' 'rats' and find out where they board. It is dangerous for honest men to board in the same house with these creatures. They are so mean that the air becomes contaminated in which they breathe." "Boycott Baughman Brothers every day in the week." "Boycott Baughman Brothers because they are enemies of honest labor." "Boycott Baughman Brothers' customers wherever you find them." "The Lynchburg boys will begin to play their hand on Messrs. Baughman boycotted goods in a short time." "The battle will not be fought in Richmond only, but in all Virginia and North Carolina will be raised the cry, 'Away with the goods of this tyrannical firm.'" "Let our friends remember that it is the patronage of the Chesapeake & Ohio, Richmond, Fredericksburg & Potomac, Richmond & Danville, and Richmond & Alleghany Railroads that is keeping Baughman Brothers up." "We are sorry to see the Exchange Hotel on the black-list. There will be two thousand strangers in this city in October, none of whom will patronize an hotel or boarding-house whose name appears on that list." "The boycott on Baughman Brothers is working so good that a man cannot buy a single bristol-board from the 'rat' firm without having his name put upon the black-list." "The old 'rat' establishment is about to cave in. Let it fall with a crash that will be warning to all enemies of labor in the future." It was proved that the conspirators declared their said pur-

pose and persistent effort to crush Baughman Bros.; that the minions of the boycott committee dogged the firm in all their transactions, followed their delivery wagon, secured the names of their patrons, and used every means short of actual physical force to compel them to cease dealing with Baughman Bros., thereby causing them to lose from 150 to 200 customers, and $10,000 of net profit. The acts alleged and proved in this case are unlawful, and incompatible with the prosperity, peace, and civilization of the country, and, if they can be perpetrated with impunity by combinations of irresponsible cabals or cliques, there will be the end of government and of society itself. Freedom, individual and associated, is the boon and the boasted policy and *peculium* of our country, but it is liberty regulated by law; and the motto of the law is, " *sic utere tuo ut alienum non lœdas.*"

The plaintiff in error was properly convicted, and the judgment of the Hustings Court complained of is affirmed.

HINTON and RICHARDSON, JJ., absent.

---

NOTE ON STRIKES AND BOYCOTTS.

There has been considerable discussion of the questions of strikes and boycotts in their criminal aspects in the various legal periodicals but in few articles of real value. The most useful are " Strikes and Boycotts at Common Law," by C. Bingham, in 21 *Am. Law. Rev.* 41 ; and, " The Boycott and its Methods," by Lester M. Dorman, in 9 *Crim. Law Mag.* 1.

In applying decisions of other jurisdictions to the New York law, two things (which have been too much ignored in the discussion of the questions) must be borne in mind : first, that the New York law of conspiracy is purely statutory, and under a statute which renders inapplicable in this State most of the common-law decisions on the subject : second, the majority of the decisions, both in this country and in England, are under varying statutes, and that these statutes must be consulted before the cases under them can be safely used.

An interesting discussion of the boycott as a conspiracy may be found in the charge of Judge ATKINS of the Richmond (Virginia)

Hustings Court, to the Grand Jury, in relation to the facts out of which grew the prosecution in Crump *v.* Commonwealth, *supra*, p. 342. This charge is as follows :

"Gentlemen of the Grand Jury—Certain witnesses will appear before you to testify in regard to the boycott of a number of our citizens, and I think it proper that I should give you some instructions upon the law of conspiracy, under which such offenses are punishable. I shall not review at length the various and somewhat conflicting decisions to be found in the law-books upon this subject, but simply give you what appears to be the law as laid down by the best text-writers on criminal law, and leave all legal questions that may arise upon the trial of the case to be decided att hat time, if you should find an indictment.

"As I stated to you on the first day of this term, presentments or indictments are mere accusations of one or more persons of a crime, and that, while you should be convinced, before finding an indictment. that the party accused is guilty, yet, if you are in doubt whether one who is morally guilty is legally so, you should find the bill, and leave the questions of law to the court. I desire to impress this particularly upon your minds at this time, because the doctrine of conspiracy is exceedingly complicated, and involved in much doubt. Chitty says (*Chit. Crim. Law*, 1139, 1140), 'There are, perhaps, few things left so doubtful in the criminal law as the point at which a combination of several persons in a common object becomes illegal. Certain it is that there are many cases in which the act itself would not be cognizable by law if done by a single person which becomes the subject of indictment when effected by several with the joint design, and there are other cases in which, though the act may be morally criminal, it is not illegal except on the ground of conspiracy. The individual cases decided depend in general on particular circumstances, and are not to be extended.'" (In this State, governed by common law. See *Schedule to Const.* p. 101, § 1, and *Code* 1873, ch. 15, p. 191, § 1.)

"A conspiracy has been defined to be the corrupt agreeing together of two or more persons to do, by concerted action, something unlawful, either as a means or an end. By 'corrupt' in this definition is meant an evil purpose, but not necessarily an intent to do what, if accomplished by one alone, would be indictable. 'Unlawful,' in this connection, signifies contrary to law, and many things are contrary to law while not subjecting the doer to a criminal prosecution. It is not necessary, therefore, in order to constitute a conspiracy, that the acts agreed to be done should be acts which, if done, would be criminal. It is enough, if the acts agreed to be done,

although not criminal, are wrongful—that is, amount to a civil wrong. 2 *Bish. Crim. Law*, §§ 171, 172, 178.

" There are many circumstances in which combinations of persons for the promotion of evil portend a danger, and call for legal inter-position, when the single efforts of individuals might pass unnoticed by the law ; therefore, the general principle on which the crime of conspiracy is founded is this—that the confederacy of several per-sons to effect any injurious object creates such a new and additional power to cause injury as requires criminal restraint, although none would be necessary were the same thing proposed, or even attempted to be done, by any person singly.     Hence it follows, as already said, that the unlawful thing proposed, whether as a means or an end, need not be such as would be indictable if proposed, or even done by a single individual.     1 *Bish. Crim. Law*, § 592 ; 2 *Id.* §§ 180, 181 ; Commonwealth *v.* Judd, 2 *Mass.* 329, 337 ; Twitchell *v.* Common-wealth, 9 *Pa. St.* 211, 212 ; State *v.* Burnham, 15 *N. H.* 396 ; State *v.* Rowley, 12 *Conn.* 101 ; People *v.* Richards, 1 *Mich.* 216 ; Regina *v.* Warburton, *L. R.* 1 *C. C.* 274.

" As to conspiracies concerning wages and the like, it may be said that while a mere combination by any class of persons to promote the interests of their particular trade is not criminal, yet there may be acts connected with it which are undoubtedly indictable.     When, therefore, you are considering a conspiracy of that sort, you must look into its special nature, and the particular means contemplated or employed, and decide the question of its indictability on princi-ples relating to these, and not on such larger doctrines as would cover all forms of combination.     In this view it has been held that a conspiracy by workmen agreeing to quit their employer in a body unless certain other workmen are dismissed, and to notify their em-ployer of such agreement, is indictable.     Here is an attempt by com-bination, not only to injure the employer and interfere with the con-duct of his business, but to injure other workmen.     2 *Bish. Crim. Law*, § 233 ; State *v.* Donaldson, 3 *Vr.* (*N. J.*) 151.     See also, *Davis Crim. Law* (*Va.*), 373.

" In another case it has been held that if there be a combination or agreement between two or more persons to force the prosecutor to conduct his business contrary to his own will, by improper threats or improper molestation, which would consist of anything done with an improper intent amounting to an annoyance or unjustifiable in-terference, having a deterring effect upon the mind of the employer, and calculated to control his will, such combination or agreement would be an illegal conspiracy for which the defendants would be liable.     But it is not necessary that any one should be personally

molested. It is enough if the molestation is designed and agreed upon with an improper intent, and was such as would be likely, in the minds of men of ordinary nerve, to deter them from carrying on their business according to their own will. But the mere fact that the accused were members of a trades union is not illegal, nor is the mere fact that they left their work a sufficient ground for you to indict them. Regina *v.* Bunn, 4 *Moak Eng. R.* 564.

"There are other decisions, giving the law of the particular cases on which they are rendered, which I do not think necessary to explain. See American cases cited in Moak's notes to cases referred to by Bishop in the above sections of his works.

"The true doctrine to be gathered from these cases seems to be that a conspiracy of this kind ceases to be legal when the means designed and intended to be used by the conspirators are characterized by force, threats, intimidation, molestation, improper interference or compulsion. Thus, as I have stated, the mere fact of belonging to a trades union is not an indictable offense ; but I submit to your judgment whether a determination and agreement on the part of the members to boycott all persons dealing with the prosecutors is not a conspiracy, not only to injure the prosecutor, and interfere with the conduct of his business but to unjustly and wrongfully molest and injure good citizens of the community.

"If you shall be satisfied from the evidence brought before you that the accused have formed a combination or agreement (whether the object thereof has been executed or not), to compel the prosecutors to employ certain men at certain prices, or otherwise to conduct their business contrary to their own will, by threats, intimidation, or improper molestation or interference, of a nature to force the prosecutors to accede to their demands, then they are guilty of a criminal conspiracy, and liable to indictment."

One of the most important of recent cases on boycotts, State (of Vermont) *v.* Stewart, 59 *Vt.* 273 ; 9 *Atl. Rep.* 559 ; 4 *New Eng. Rep.* 378 ; 59 *Am. Rep.* 710, has already been referred to in a prior note, p. 321. This case should be carefully read, and furnishes, with the present case, Crump *v.* Commonwealth, People *ex rel.* Gill *v.* Walsh, 5 *N. Y. Crim. Rep.* 509, and *ante,* p. 292, and State *v.* Glidden, *ante,* p. 321, a full discussion of the question. In the note to State *v.* Stewart, in 4 *New Eng. Rep.* 378, many authorities are given.

Two useful notes may be found in the *American Decisions,* one a note to People *v.* Fisher (14 *Wend.* 9), at 28 *Am. Dec.* 509, on "Conspiracies to Control the Wages of Workmen," and another (a note to Smith *v.* People, 25 *Ill.* 17), at 76 *Am. Dec.* 780, on "Boycotting as a Criminal Conspiracy."

Consult also *Wright on Criminal Conspiracy*, §§ 12, 13.

To the American edition of this work (published by the Blackstone Pub. Co.) is appended "The Law of Criminal Conspiracy and Agreements," etc., by Hampton L. Carson, which contains not only a nearly complete collection of the American authorities taken from the reports, but gives several important cases which have only appeared in pamphlet form. The law as to boycotts and strikes will be found at page 144 *et seq.*

For other cases in these reports on strikes and boycotts, see People *v.* Wilzig, 4 *N. Y. Crim. Rep.* 403, and People *v.* Kostka, *Id.* 429.